**MALL TOOL CO. v. QUAKER VIBRA-TORS, Inc., et al.**
No. 9933.

District Court, E. D. Pennsylvania.
July 27, 1939.

James C. Wobensmith, of Philadelphia, Pa. (Harry H. Hitzeman, of Chicago, Ill., of counsel), for plaintiff.

W. P. Bair, Will Freeman, and Bair & Freeman, all of Chicago, Ill., for defendants.

KIRKPATRICK, District Judge.

The patent in suit is 2,015,217 to Deniau. The claims in suit (5 and 6) are method claims and are directed to compacting or settling newly poured concrete of the dryer, stiffer kind by immersing a mechanical vibrator (of a type not particularly specified) in the concrete mass, moving it "progressively" in the material (claim 5), and pulling it out slowly, so that it will not leave a hole (claim 6).

Claim 5 actually is as follows: "Method for vibrating concrete or a similar material having at rest a fluidity which is very small or null by means of a vibrating body in contact with the said material, which consists in immersing the said body, at least partially, in the said material, in causing it to vibrate with sufficient intensity in order to render the surrounding material substantially fluid, and in progressively moving the said vibrating body in the material."

Claim 6 adds, "and in withdrawing therefrom sufficiently slowly in order that the vibrated material should fill up, in proportion to the withdrawal of the vibrating body, the space left by the latter."

If attention is directed to the words "progressively moving," the reader will probably wonder what kind of motion is intended to be described by them, and, as a matter of fact, the whole case turns upon the meaning to be given to the word "progressively." It must be conceded that, having placed a vibrating cylinder in a pile of wet concrete, it would be a little difficult for one to figure out how to move it "in the material" in any way other than progressively. Merely pulling it out might be a non-progressive movement, but the words "in the material" call for something more than that. A possible theory (though, naturally, one to be avoided if possible) is that the word was not intended to mean anything at all, and that what is claimed is any and all ways of moving the vibrator about in the concrete—in other words, a movable vibrator as distinguished from one fixed in a mould about which the concrete can be poured. However, putting this possibility aside, if the word means anything, it can, in view of the file history, mean only one of two things: first, moving the vibrator about in the concrete, as distinguished from putting it in at one place, keeping it there a proper time, taking it out, moving it to another place, putting it in, and so on; or second, lifting it from time to time as the level of the concrete rises when batches of fresh material are poured in to take the place of that which has been sufficiently vibrated and settled. If it means the latter, then there is, concededly, no infringement.

The first meaning strikes one at once as very unlikely. It is hard to see why reaching all necessary parts of a mass of concrete by successive insertions of the vibrator is not just as progressive a movement as reaching them by moving the vibrator through the material without taking it out; and, in the second place, there is absolutely no difference in the result and no practical reason for making the distinction. As to the second meaning, it appears to be reading into the word a good deal which does not appear in the claim and can only be justified if the proceeding to obtain the patent plainly indicates that it was what the patentee

and the other party to the contract, the Government, understood it to mean or agreed that it should mean. This calls for a study of the file history of the patent, in the light of the development of the art.

In the early 1920's the advantages of using a "dry mix" concrete, particularly in large scale construction work, were beginning to be understood by contractors and builders generally. It was cheaper, dried more quickly, and was less likely to leave voids or pockets caused by the evaporation of the water. On the other hand, it was stiff and harder to handle in pouring. The ordinary hand-puddling or tamping methods of compacting were inadequate, and resort was had to mechanical vibration, which usually took the form of vibrating the wooden forms from the outside by mechanical hammers or vibrators. Sometimes it was found convenient to vibrate the forms from the inside, and when this was done, the instrument, whatever it happened to be, was necessarily partly immersed in the concrete. On occasions, when the construction was reinforced, the reinforcing rods were vibrated by hammers placed against their ends. Then there was also a method of surface vibration that was somewhat extensively used, which consisted in laying flat platforms of boards on the top of the cement to be compacted and running vibrating machines over them. Prior to 1926, internal vibration of concrete by putting the vibrator directly in the mass was not generally practiced, there were no mechanical vibrators manufactured which were adapted to this use, and such internal vibration as was done was almost accidental—certainly incidental to the generally used surface or form vibration.

Outside the field of laying concrete the only instance of internal vibration which appears to have been practiced was the use of a vibrating rod having a shovel-shaped end, in compacting the ballast under railroad ties. The end of this rod was pushed into the mass of stone and the vibration undoubtedly operated to settle it in much the same way that the more fluid mass of concrete was settled.

I think that, if it were material, the owner of the patent would be entitled to a finding that the broad claim for the use of internal vibration which he originally made in his patent application was not directly anticipated by prior uses—at any rate not in concrete construction. If that claim had been allowed we would then have to determine whether or not it was an inventive step, but, as will appear, the claim was withdrawn, and we are consequently concerned only with the scope of the claims which were finally allowed.

This brings us to the file history of the patent. It must be very carefully examined, because I think that it shows, without much doubt, that the patent was granted upon the understanding that the claims covered nothing beyond a method by which the vibrator was floated upon the top of the concrete mass and was raised "progressively" as the level of the mass rose, either by being pushed up by the concrete itself or by being lifted from time to time by hand or by mechanical means, as each fresh layer of concrete came in.

The patent was eight years in the Patent Office. The application was filed November 28, 1927, but, under the statute, U. S. C. T. 35, Sec. 32, 35 U.S.C.A. § 32; R.S. § 4887, was entitled to a somewhat earlier date, having been within one year of the filing date of a French patent of common subject matter. The application as originally filed contained 20 claims, for both process and apparatus. They attempted to cover the whole field and described almost every possible method of vibrating concrete. In a general way, they fell into four main groups, which were: (1) vibrating forms or moulds, (2) vibrating conduits through which concrete moves or is poured, (3) vibrating concrete by immersing a vibrator directly into the material, and (4) vibrating by means of a device which floats the vibrator in the material.

Division was required, and, in response, the applicant cancelled all the claims except claim 8, which was generally "for the vibration of a pasty or like substance in which the vibrator is directly immersed in the said substance," and three claims (11, 12, and 19) describing a floating vibrator and its method.

It is not necessary to follow the course of this application in detail. As seen, after division it started out with one very broad claim for the whole process of internal vibration, and specific claims for the floating vibrator method. Various new ideas seem to have occurred to the applicant from time to time, resulting in the addition of new claims, about which there was a certain amount of argument, but in general the file history shows that the floating vibrator claims were allowed promptly and remained in the patent as finally grant-

ed, and that all other claims, including claim 8, were disallowed and cancelled.

The two claims in suit were among the last ones added. What occurred at that time is important. The applicant had been tenaciously clinging to claim 8 in spite of several rejections. At one time (July 25, 1931) he apparently had succeeded in having it allowed, but on February 24, 1932, the examiner, citing Atterbury 1,293,662, and another patent, finally rejected it as fully met by either of the two references.

Atterbury disclosed an apparatus, apparently designed for making concrete pipes, in which a cylindrical vibrator formed the core of the mould, its ends being attached to it, and consequently not being movable. Although it might have been argued that it was more like a surface vibrations method than internal vibration, the examiner cited it as anticipatory of the broad internal vibration claim. ·

The applicant's response to this action of the examiner was to cancel claim 8 and substitute the two claims now in suit. His remarks should be read in full, but he certainly appears to be pointing out that these two claims are simply intended to extend the floating vibrator process claims so that the patent will cover not merely the automatic rise of the vibrator floating on the surface of the concrete as new concrete is poured in, but also lifting it, either by hand or mechanically, as the surface of the material is raised. I do not see how. this can be construed otherwise than as a complete surrender of all claim to the general process of internal vibration by immersion of the vibrator, and it seems clearly to fix an agreed meaning upon the word "progressively" in the claim.

This conclusion is considerably strengthened if one looks at the action of February 1, 1932, just preceding the cancellation of claim 8. In disallowing two other claims which called for a vibrator suspended over the material and immersed in it, the examiner said, "Applicant has in his prosecution of the case elected to prosecute the species shown in Figs. 15, 16, 17, 18 and 20 wherein the vibrator actually floats in the concrete. He cannot now add claims to an entirely different and distinct species." Parenthetically, this statement may furnish a clue to the reason that claim 8 was at one time allowed. The examiner may have considered it as limited to a floating proc-

ess. However, the applicant did not in any way challenge this statement by the examiner as to what the applicant's position was, but apparently acquiesced in it by cancelling claim 8 and adding the two claims calling for progressive movement.

My conclusion is that the words "progressively moving" in claims 5 and 6 must be construed as a step in a method in which the vibrator floats upon the surface of the concrete, and as meaning lifting the vibrator from time to time as the surface to be vibrated is raised by the addition of material.

Whether the applicant was right or wrong in acquiescing in the examiner's view that the Atterbury patent anticipated the broad internal vibration claim (claim 8) is beside the point. It seems to be plain that he did so acquiesce and that the patent as issued does not cover the general method.

As construed above, the Mall Tool Company does not infringe the claims in suit.

This suit began as a bill in equity by Mall Tool Company against Quaker Vibrators asking for a declaratory judgment upon the validity and infringement of all the claims of the Deniau patent. Les Procedes Techniques De Construction intervened as party defendant upon the allegation that it and not Quaker Vibrators was the owner of the patent, and counter-claimed for infringement. At the trial the following stipulation was entered: "It is understood that this case is to be tried as though it were an ordinary infringement suit with the Quaker Vibrators, Inc., and Les Procedes Techniques De Construction as the plaintiffs, and the Mall Tool Company as the defendant, and that when that has been determined a decree will be entered in the declaratory judgment suit in conformity with the findings and conclusions in the infringement suit".

In this state of the record, I think that judgment should be entered for Mall Tool Company against Les Procedes upon the counterclaim, and that upon the declaratory judgment bill judgment be entered that Mall Tool does not infringe any of the claims of the patent. Determination of validity, in view of the construction of the claims, is unnecessary.

Judgment accordingly.