82 N.J. Super. 531 (1964)
198 A.2d 469
AMERICAN PHOTOCOPY EQUIPMENT COMPANY, A CORPORATION (SUBSTITUTED AS PLAINTIFF-APPELLANT FOR COPEASE MANUFACTURING CO., INC.), PLAINTIFF-APPELLANT,
v.
AMPTO, INC., A CORPORATION, DEFENDANT-RESPONDENT, AND AMPTO EQUIPMENT CORPORATION, ET AL., DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued November 12, 1963.
Decided February 20, 1964.
*534 Before Judges CONFORD, FREUND and SULLIVAN.
Mr. Alfred C. Clapp, and Mr. William C. Conner of the New York bar, admitted pro hac vice, argued the cause for appellant (Messrs. Clapp & Eisenberg, attorneys).
*535 Mr. Samuel J. Stoll of the New York bar, admitted pro hac vice, argued the cause for respondent (Messrs. Morris, Downing & Sherred, attorneys; Mr. John R. Knox, of counsel).
The opinion of the court was delivered by CONFORD, S.J.A.D.
This is an action to recover royalties under a patent license agreement allegedly entered into by Copease Manufacturing Co., Inc. (Copease), a corporation of the State of New York, and Ampto, Inc. (Ampto), a corporation of the State of New Jersey. The action was originally brought by Copease against Anken Chemical & Film Corp. (Anken) and its two wholly-owned subsidiaries, Ampto and Ampto Equipment Corp. At the pretrial conference, the suit was voluntarily withdrawn, without prejudice as to Anken and Ampto Equipment Corp. American Photocopy Equipment Company (Apeco) is the substituted plaintiff as assignee of the interest of Copease in the license agreement.
The subject matter of the contract in question is U.S. Patent No. 2,657,618, issued to one Walter Eisbein on November 3, 1953. The patent claims invention of a machine designed to develop photocopies according to the diffusion-transfer-reversal process. Copease acquired title to this patent by assignment, and in 1956 granted the license in dispute to Ampto. The royalty provision of the agreement follows:
"2. Licensee agrees to pay a royalty of six percent (6%) of the net retail selling price for each photocopying machine embodying any of said inventions [of the Eisbein patent] and made, used or sold or otherwise disposed of under the provisions of this agreement."
Ampto has asserted two defenses. First, it disputes the authority of the officer who signed the agreement to bind the defendant corporation. Second, it contends that the photocopy machines it made or sold do not "embody the inventions" of the Eisbein patent and therefore do not come within the obligating terms of the contract. The trial judge, sitting *536 without a jury, entered judgment for defendant on the latter ground and found it unnecessary to decide the former. Since we find that the machines involved do embody the invention disclosed by the patent in suit, it will be necessary for us to consider the issue as to whether the corporate defendant is bound by the agreement.

I.
Charles E. Hallenborg, president of Copease, testified that negotiations with Ampto for the sale of photocopying machines were initiated by representatives of Ampto in January 1956. At various times Ampto was represented by Mahlon Boyer, an employee of Ampto and vice-president and a director of Anken, Anna C. Campbell, vice-president, treasurer, and a director of Ampto and president and majority shareholder of Anken, and Louis P. Ratti, president and a director of Ampto. Ratti testified that he was at all times opposed to taking a license from Copease and that he never discussed such an arrangement with Hallenborg.
In February 1956 Hallenborg sent a form of license agreement to Boyer. An executed verbatim copy thereof, naming Ampto as the licensee, was returned by Boyer to Copease on March 8, 1956. As returned, this contract form was signed for the licensee by Anna C. Campbell, "Pres." It had been prepared by Morris, Downing & Sherred, attorneys for Ampto, and was contained within the form backer of that firm. Willis H. Sherred, a partner in the firm, and secretary and director of Ampto, testified that the Copease form of contract came across his desk, but that he gave it to a secretary to use in preparing the agreement without reading its contents. He stated that he knew at the time that the instrument was a license agreement between Copease and "some other corporation." Execution of the disputed agreement was completed on March 19, 1956 with the appending thereon of the signature of Hallenborg on behalf of Copease.
The conduct of the parties following the execution of the license agreement bears significantly upon the issue of defendant's *537 responsibility thereon. The contract called upon Ampto to furnish Copease with annual financial and sales statements. Failing to receive such statements for the first year of the agreement, Hallenborg wrote to Boyer in June 1957 requesting them. In a telephone conversation on August 13, Boyer agreed to comply. Still not having received statements by September 4, Hallenborg telephoned Ratti, who was vague as to his intentions with respect to the license but never questioned its validity. He suggested that Hallenborg call Sherred.
A telephone call to Sherred was made shortly thereafter by William C. Conner, patent attorney for Copease. Conner testified that he complained to Sherred that Copease had received neither royalty payments nor any statement as to how many machines Ampto had sold, as was required under the agreement. Sherred assertedly said he knew of no sales of any machines. Sherred also said, according to Conner, that Ampto was awaiting the outcome of an infringement suit in Illinois in which the validity of the Eisbein patent was at issue (Copease Mfg. Co. v. American Photocopy Equipment Co., 189 F. Supp. 535 (N.D. Ill. 1960), reversed in part 298 F.2d 772 (7 Cir. 1961)), and that if the patent was there determined to be invalid Ampto would be absolved of liability for royalties. Conner testified that when he then explained to Sherred that the validity of the patent was not relevant to Ampto's liability under the license agreement, Sherred stated that if Ampto sold the Eisbein machines, it would pay the royalties. Sherred's testimony for defendant, though vague and evasive, was essentially corroborative of Conner's version of the conversation except for the affirmative statement as to intention to pay royalties.
The authority of Mrs. Campbell to execute the license agreement was never questioned by Ampto until it filed its amended answer on January 20, 1960. (This action was instituted March 2, 1959.) At all pertinent times, all of the offices and directorships of Ampto were held by Ratti, Sherred, and Mrs. Campbell. Mrs. Campbell, of course, knew of the *538 agreement from its inception, while Ratti learned of it "shortly after it was signed." Sherred, if he did not read the contract when he undertook to prepare the copy for Mrs. Campbell's signature, which strains credulity, became aware of its existence at least in the fall of 1957 when he spoke with Conner. Sherred also testified that the license was discussed at an informal meeting of the directors of Ampto in April of 1957 or 1958.
Since we find that there is no serious dispute over the basic, operative facts, a remand to the trial court for findings of fact on the issue is unnecessary. Nor need we decide whether Mrs. Campbell possessed actual or apparent authority in the matter. We find that the defendant corporation ratified the license contract by acquiescing, through its officers and directors, in what we shall assume, arguendo, was the unauthorized act of its vice-president.
It is well established that binding ratification of an unauthorized contract by a corporation "will be implied from acquiescence or the acceptance of the benefits of such contract; it being essential to implied ratification that it and the acceptance of benefits be with knowledge of the facts." Feist & Feist v. A. & A. Realty Co., 105 N.J.L. 461, 464 (E. & A. 1929). See also Oliver v. Autographic Register Co., 118 N.J. Eq. 72, 75 (Ch. 1935), affirmed o.b. 119 N.J. Eq 481 (E. & A. 1936); Royal Blue, &c., Inc. v. Delaware River, &c., Inc., 140 N.J. Eq. 19, 23 (Ch. 1947), appeal dismissed, 2 N.J. 73 (1949); Beach v. Palisade Realty and Amusement Co., 86 N.J.L. 238, 242 (E. & A. 1914). In the New Jersey cases, acquiescence has been concomitant with or evidenced by the acceptance of tangibly ascertainable benefits of the contract. E.g., Feist & Feist v. A. & A. Realty Co., supra, 105 N.J.L. 461 (defendant corporation accepted rents under realty management contract with plaintiff); Shaten v. American Nat. Bank of Camden, 109 N.J. Eq. 307 (Ch. 1931) (officers of corporation deposited bonds with bank as collateral for loan; corporation used proceeds of loan to meet payroll). However, evidence of acceptance of benefits is not absolutely required, *539 for the general rule is set forth in the disjunctive; either "acquiescence or the acceptance of benefits" will suffice. See Freeport Journal-Standard Pub. Co. v. Frederick W. Ziv Co., 345 Ill. App. 337, 103 N.E.2d 153 (App. Ct. 1952). Since it is the formation of the contract with which the doctrine of ratification is concerned, it is the principal's acceptance of the existence of the contract that is dispositive, not its acceptance of benefits thereunder. The latter circumstance is merely probative of the former, i.e., evidence from which approval can be implied. See 2 Williston, Contracts (3d ed. 1959), § 278. It may be here noted that Ampto did in fact enjoy the only benefit contemplated under the license agreement, i.e., liberty to manufacture or sell the patented machine free from suit by Copease for patent infringement.
It is also well established that silence on the part of the corporation, i.e., failure to disaffirm the unauthorized act of its agent within a reasonable time, will under certain circumstances amount to the acquiescence from which ratification will be implied. Royal Blue, &c., Inc. v. Delaware River, &c., Inc., supra (140 N.J. Eq., at p. 23); Johnson v. Hospital Service Plan of N.J., 25 N.J. 134, 141 (1957); 2 Fletcher, Cyclopedia of Corporations (rev. ed. 1954), § 769, pp. 1121-1123; 19 C.J.S. Corporations § 1019, p. 497; 13 Am. Jur., Corporations, § 983, p. 935; Restatement, Agency 2d (1958), § 94, p. 244, comment (a). The circumstances in which silence will amount to ratification are those where, "according to the ordinary experience and habits of men, one would naturally be expected to speak if he did not consent." Ibid. One of the most important of such circumstances is full knowledge of the nature and extent of the unauthorized act. Feist & Feist v. A. & A. Realty Co., supra, 105 N.J.L., at p. 464; Royal Blue, &c., Inc., supra, 140 N.J. Eq., at p. 23.
It is undisputed that all three directors of Ampto had full knowledge of the license agreement within approximately one year of its formation. Two of these, the president and vice-president, knew of the contract practically from its inception. *540 Yet, as noted above, no question as to the authority of Mrs. Campbell was raised until January 20, 1960, almost four years after execution of the agreement, when the amended answer was filed below. Cf. Royal Blue, &c., Inc., supra, 140 N.J. Eq., at p. 23. Ampto's original answer, filed July 3, 1959, admitted the existence of the license agreement "except as to legality."
Defendant, through its president and secretary, remained silent in respect of acquiescence or disaffirmance when it was directly confronted through telephone calls from Hallenborg and Conner with the fact of the existence of the license and Copease's assumption that it was in effect between the parties. Cf. Royal Blue, &c., Inc., supra, 140 N.J. Eq., at p. 23, where the court pointed out that the officers and directors of the defendant silently permitted its president to carry on further negotiations on its behalf in relation to the subject matter of an originally unauthorized contract. When one is directly confronted with the unauthorized act of his agent, "according to the ordinary experience and habits of men, one would naturally be expected to speak if he did not consent." Restatement, supra, § 94. In this regard, it is not necessary, in order to find evidence of acquiescence in the conduct of Sherred, to accept Conner's testimony, disputed by the former, that he affirmatively signified acceptance of the contract. Sherred's admitted silence on the subject of authority and the natural implications implicit in his discussion of the effect of the Illinois infringement suit on Ampto's liability are sufficient. As stated in 13 Am. Jur., Corporations, § 983, p. 935:
"The acquiescence of a corporation which will amount to ratification of an unauthorized act may be evinced by mere silence under circumstances giving rise to a duty to repudiate the transaction; a corporation cannot stand by after it has learned of an unauthorized act or contract * * * and have its benefit if it should prove to be favorable and reject it if it should prove unfavorable."
We hold that the officers and directors of Ampto ratified the act of its vice-president, Mrs. Campbell, by their acquiescence *541 therein, and that the corporation is bound by the terms of the license agreement on which this suit is based.

II.
The remaining and central question on this appeal is whether the photocopy machines manufactured or sold by Ampto "embody any of said inventions" disclosed in the Eisbein patent in suit. At the outset, we note that the finding by the trial judge that there was no proof that defendant sold any machines ("if there were any such" within the patent) is contradicted by the record, and defendant does not seek to sustain the judgment on any such ground. Boyer testified defendant sold machines of the kind in controversy. Further, defendant expressly conceded at the trial that it had sold the type of machine alleged to come within the patent.
It is settled that the test of whether machines sold by a patent licensee come within the coverage of the patent, for purposes of a suit for royalties, is the same as that employed in a patent infringement suit. Cold Metal Process Co. v. United Engineering & Foundry Co., 235 F.2d 224, 229 (3 Cir. 1956). Most of the cases cited in the discussion which follows involved infringement. We also note, but do not rely for our conclusions on the fact that some of the machines sold by Ampto were purchased from the Speed-O-Print Corporation, which consented to a decree of infringement in an action brought by Apeco under the Eisbein patent here involved. American Photocopy Equipment Company v. Speed-O-Print Corp., (N.D. Ill. Docket No. 60-C-1053, consent decree entered November 2, 1962).
In the case at hand the trial court found that the machines sold by defendant were so dissimilar to that envisaged by the Eisbein patent as not to "embody the inventions" of that patent. For reasons to be stated, we hold to the contrary. The trial court's decision appears to have been based on the erroneous concept that an accused machine is not covered by a patent if it is not within the expressed "specifications" *542 of the patent, independently of whether it comes within its "claims." But it is elementary that while the claims of a patent must be "interpreted in the light of its specifications," Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 217, 61 S.Ct. 235, 85 L.Ed. 132 (1940), it is the claims which are the real measure of the invention covered by the patent. Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U.S. 336, 339, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961); 35 U.S.C.A. § 112. The cited statutory section recites that: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." There is a substantial difference between interpreting a claim "in the light of" the specifications, on the one hand, and raising the specifications to the level of a declaration of invention on the other. As we read its conclusions, the trial court in effect did the latter in determining this controversy. This was error.
We have decided, nevertheless, to dispose of this case at the appellate level. No advantage would be gained by a remand. The machines have been exhibited to us and we have carefully considered all the extensive documentary exhibits in evidence, although we have not deemed it necessary to refer to all of them in this opinion. Solution of the question of coverage turns basically on construction of the Eisbein patent, and that issue is ultimately one of law. Solomon v. Renstrom, 150 F.2d 805, 808 (8 Cir. 1945); 2 Walker, Patents (Deller's ed. 1937), § 245, pp. 1209-1210. Since the questions of fact that are implicated do not in our analysis of the issues significantly involve the credibility of the witnesses who testified at the trial, the interests of expediency will best be served by our deciding the entire matter on this appeal. The parties have been given the opportunity to file supplemental briefs and appendices on all the issues and we have considered all of them.
As noted above, all the machines involved in this litigation, both that described in the patent and those sold by defendant, *543 are designed to carry out the diffusion-transfer-reversal process of photo-copying. This process, disclosed in U.S. Patent No. 2,352,014, issued in 1941 to one Andre Rott, effects the transfer of an image from a negative to a positive sheet without the use of light and without the need for developing, fixing, and drying each photographic sheet separately, as in the orthodox photographic developing process. (The Rott patent did not disclose any machine comparable to those here involved.) [Court describes exposure and development of negative.]
The second stage of the process, at which the use of these machines comes into play, calls for the negative to be moistened with a processing solution and brought into face-to-face contact with a positive sheet which has also been moistened. The positive sheet has previously been coated with an emulsion containing nonphotosensitive grains. The negative and positive sheets are pressed together and left in contact for from 20-30 seconds, during which time the image is transferred from the negative to the positive.[1]
Inventors working with the development stage of this process were faced with the problem of devising a self-contained apparatus which would take the negative and positive sheets, moisten them with the processing liquid, bring them together so the emulsion-coated surfaces would be in a face-to-face relationship, squeeze them together so as to transfer the image, expel the excess processing liquid and allow for quicker drying, and present them to the operator in a semi-dry, unwrinkled state. And, to make this a one-step process in a self-contained apparatus, the path traveled by the sheets would have to be curved, since in order for the machine to be liquid-tight, the sheets would have to enter and leave it above the level of the processing solution.
The first patent for a machine or device in this field was French Patent No. 879,995, issued in 1942 to Farbenindustrie *544 Aktiengesellschaft (hereafter Agfa), a German photographic firm. This is the only prior art involving machines introduced by the parties in this litigation. [Court describes Agfa machine.]
The machine disclosed by the Eisbein patent in suit was the next major advance in this field. This machine is also housed in a liquid-tight casing which contains the processing fluid. Placed inside this casing is a series of curved, rigid plates which are arranged in substantially parallel, superposed position so as to form slideways through which the photographic sheets are guided from slots in the side of the casing formed by the ends of these plates, down through the processing fluid, and up to a single pair of rollers whose point of tangency is above the level of the liquid. After passing through the rollers, the sheets are deflected by stripping plates and pass out through an opening in the back of the machine. (The details of the Eisbein machine will be discussed more fully below.)
From these brief descriptions, it is evident that there are substantial differences between the Agfa and Eisbein machines. [Court describes the differences between Agfa and Eisbein machines.]
It is not here material whether these distinctive features of the Eisbein machine operate to establish validity of the Eisbein patent as displaying invention over prior art. For present purposes the Eisbein machine is presumed patentable invention over the Agfa device. This is for the reason that "the licensee under a patent license agreement may not challenge the validity of the licensed patent in a suit for royalties due under the contract." Automatic Radio Mfg. Co. v. Hazeltine Research, 339 U.S. 827, 836, 70 S.Ct. 894, 899, 94 L.Ed. 1312 (1950). Defendant is therefore precluded from here questioning the validity of the Eisbein patent.[2]
*545 Ampto has, however, legitimately introduced the Agfa patent in evidence pursuant to the principle that a licensee is entitled to argue prior art to restrict the scope of a patent. See Cold Metal Products Co. v. Crucible Steel Co. of America, 247 F.2d 241, 248 (3 Cir. 1957). It has consequently properly argued that in the comparison of the patented and accused machines to determine whether the latter come within the coverage of the patent, such coverage is to be treated as extending only to those features of the patented machine that differ from the Agfa device. However, as we have seen, the differences between the two are radical. And, as will be developed later herein, the differentiating characteristics of the Eisbein machine have all been substantially incorporated into Ampto's devices.
Defendant contends that the accused machines differ from that envisaged by the patent in suit and therefore do not come within the license agreement which requires the payment of royalties only for the sale of machines "embodying the inventions covered by said letters patent."
The role of the court in this respect is to determine from the language of the claims of the patent in suit the characteristics of the particular kind of photocopy machine that Eisbein invented and licensed to Ampto and then to examine the accused machines to determine whether they are the same as that envisaged by the patent in terms of their structure, mode of operation, and results accomplished. United States Industries v. Otis Engineering Corp., 254 F.2d 198, 204 (5 Cir. 1958). The initial step in this exercise is to determine whether the language of the claims literally describes the accused machines. "If accused matter falls clearly within the claim, infringement is made out and that is the end of it." Graver Tank & Mfg. Co. v. Linde Air *546 Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950).
A further inquiry may arise if either party invokes the doctrine of equivalents. This doctrine holds that patented and accused matter are (or are not) the same when they do (or do not) "perform substantially the same function in substantially the same way to obtain the same result." Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929). The doctrine of equivalents may aid the patentee notwithstanding that an accused device avoids the literal impact of the language of the claims of the patent. Graver Tank & Mfg. Co. v. Linde Air Products Co., supra, 339 U.S., at pp. 607-609, 70 S.Ct. 854, 94 L.Ed. 1097. Conversely, it may also operate to insulate from the coverage of a patent the device of a licensee or accused infringer which is literally described by the broad language of a claim but which, for example, performs the same or a similar function in a substantially different way. Ibid.; Flowers v. Austin-Western Co., 149 F.2d 955, 958 (7 Cir. 1945).
The main difference between the accused and patented machines relied upon by defendant is in the structure and function of the rigid guide plates briefly described above. The upper and intermediate or separator plates in the accused machines terminate shortly past the point where they enter the processing fluid. Because of this and the fact that the upper plate curves downward at its lead edge, the photographic sheets inserted between the plates are progressively forced into contact (except for the fluid on their surfaces) as they pass the low point of the curve of the lower guide plate, and the rising portion of the upper sheet rides in proximity to the lower from that point to the rollers. This proximity does not, however, involve the compression between the sheets that takes place as they go through the rollers. Defendant argues that the Eisbein patent calls for upper and intermediate plates that are parallel and extend from the opening in the casing where the sheets are inserted to a point adjacent the nip of the rollers. In this way, it is submitted, the *547 patent intentionally effects complete separation of the sheets inside the machine until they reach the rollers. This difference from the Eisbein device is not insubstantial, it is argued, as it represents two conflicting schools of thought concerning the best way to carry out the diffusion-transfer process.
The first problem, then, is to determine whether the language of the independent claims of the patent (No. 1 and No. 5) substantiates the interpretation argued for by the defendant.
Claim No. 1 reads as follows:
"1. A device for developing exposed photographic sheet material and for simultaneously transferring an image on to an unexposed transfer sheet material by moistening the materials with a developer liquid and by subsequently pressing the materials into contact one with another, said device comprising a casing adapted to hold the developer liquid therein at a given level, and having an opening therein above such level, an arrangement of contacting rollers within the casing, and guiding means within the casing adapted to guide a plurality of strips in paths from said opening to the point of tangency of the rollers, at least one of said paths extending below the level of the liquid in the casing, said guiding means being constructed and arranged to allow access of liquid to at least one of said strips, and said guiding means including means extending between strips guided therein and including means extending from such opening to a point adjacent the rolls for engaging and guiding the outsides of strips separated by said last means for preventing contact between the strips at least in the portion of the path between the opening and a point adjacent the level of the liquid."
Defendant first relies upon the following portion of the claim language to support its contention: "A device * * * having * * * guiding means [i.e., guide plates] * * * including means extending from such opening [in the casing] to a point adjacent the rolls for engaging and guiding the outsides of strips * * *." Concededly, the most reasonable interpretation of this language is, as defendant contends, that it calls for an upper plate which extends to a point near the bite of the rollers. The plural "strips" is used, and must mean both the upper and lower photographic sheets. The "means" guiding and engaging the "outside" of the upper sheet is the upper guide plate, and the claim therefore literally requires *548 that this "means" extend from the opening in the casing where the sheets are inserted to "a point adjacent the rolls," just as the means (bottom guide plate) engaging and guiding the lower sheet. As noted above, the upper plate in defendant's machines does not extend that far, but terminates at the low point of the curve of the lower plate.
A different conclusion must be drawn in relation to the indicated length of the intermediate guide plate. The language of claim No. 1, continuing from what is quoted above, is as follows: "* * * strips separated by said last means for preventing contact between the strips at least in the portion of the path between the opening and a point adjacent the level of the liquid." The "means" here mentioned must necessarily refer to the separator or intermediate guide plate. The phrase beginning with "at least" supports plaintiff's contention that the patent does not necessarily require an intermediate plate extending all the way to the rollers; that is, it need only extend to the liquid to separate the sheets until they have been moistened.
Defendant's expert witness testified that the language, "a point adjacent the level of the liquid," did not mean the level nearest the opening in the casing, i.e., the point where the sheets first enter the liquid, but, rather, the point near the rollers where the sheets leave the liquid. Defendant relies for this construction on the fact that the specifications and drawings of the patent disclose intermediate plates which extend down through the liquid and curve upward to a point immediately under the point of tangency of the rollers, that point being at the level of the liquid where the photographic sheets emerge. The argument rests on the aforementioned principle that "the claims of a patent are always to be read or interpreted in the light of its specifications." Schriber-Schroth Co. v. Cleveland Trust Co., supra, 311 U.S., at p. 217, 61 S.Ct., at p. 238, 85 L.Ed. 132; Scherbatskoy v. United States Steel Corp., 287 F.2d 552, 556 (7 Cir. 1961).
However, as noted above, while the specifications may shed light on the claims, it is axiomatic that the latter are the *549 real measure of the invention covered by the patent. Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 418-419, 28 S.Ct. 748, 52 L.Ed. 1122 (1908); Aro Mfg. Co. v. Convertible Top Replacement Co., supra, 365 U.S., at p. 339, 81 S.Ct. 599, 5 L.Ed.2d 592; 35 U.S.C.A. § 112. In the specifications, the patentee is only required to "set forth the best mode * * * of carrying out his invention." Ibid. (emphasis added). It is obvious that "best" does not mean "only," see Smith v. Snow, 294 U.S. 1, 11, 55 S.Ct. 279, 79 S.Ct. 721 (1935), for "if this were not so[,] most patents would be of little worth. * * * The invention, of course, must be described and the mode of putting it to practical use, but the claims measure the invention." Continental Paper Bag Co. v. Eastern Paper Bag Co., supra, 210 U.S., at pp. 418-419, 28 S.Ct., at p. 75, 52 L.Ed. 1122. Under defendant's argument, if the specifications and drawings of the patent in suit disclosed a short intermediate plate, Eisbein's patent would be correspondingly restricted to that form of his invention notwithstanding the claim itself was not restricted to such a short plate. That untoward result is precisely why the scope of a patent is determined by the broader language of the claims, under the statute and controlling cases cited.
We thus conclude that notwithstanding the specifications of the patent, the most reasonable and natural interpretation of the claim language last above quoted is that "level of the liquid" refers to the point where the sheets enter the liquid. Had the patentee intended the construction contended for by defendant, much more clearly specificatory language could have been used in the claim. Moreover, if we were to accept defendant's construction of "level of the liquid" as the level where the sheets leave the liquid, the words "at least" would become meaningless. Those words imply that the intermediate plate can extend further than the point described as the "least" point. But in actual fact the intermediate plate cannot physically go further than to the level where the sheets leave the liquid because the rollers are suspended there. *550 Therefore, "level of the liquid" must mean the "least" point to which the plate can be extended from the opening, and that point is, of course, that level of the liquid where the sheets first enter it. To conclude otherwise because of the specifications would be "to read the specifications, which taken in their entirety are merely descriptive or illustrative of [the] invention [citations omitted], as though they were claims whose function is to exclude from the patent all that is not specifically claimed." Marconi Wireless Telegraph Co. v. United States, 320 U.S. 1, 23, 63 S.Ct. 1393, 1404, 87 L.Ed. 1731 (1943).
Defendant has pressed upon this court the decision of the First Court of Civil Law of the Supreme Court of Germany in Lumoprint-Zindler K.G. v. Boeger, supra, in supposed support of its construction of the Eisbein patent. That court construed Eisbein's German patent on a photocopy machine of generally similar nature as requiring an extended intermediate guide plate. We have given that opinion qualified weight, however, because of the substantial difference in wording between the German patent and that involved here, a difference probably stemming from the fact that in Germany patent claims are generally drafted more narrowly than is the practice in the United States. Crotti, "The Allgemeine Erfindungsgedanke in the German Patent," 39 Journal of the Patent Office Society 477 (1957).
Defendant looks for further support to the history of Eisbein's application for the patent in suit (file-wrapper history). Claim No. 1, as originally framed and filed on April 17, 1950, contained no mention of guiding means between and separating the sheets. This first appeared in a claim substituted for claim No. 1 (which was subsequently issued as claim No. 1), filed on February 18, 1952. Defendant urges that the claim as issued must be interpreted in the light of this history, Schriber-Schroth Co. v. Cleveland Trust Co., supra, 311 U.S., at p. 218, 61 S.Ct. 235, 85 L.Ed. 132, and that such history supports its contention that the patent calls for an intermediate guide plate extending to the nip of *551 the rollers so that the sheets be separated at all times before reaching the rollers.
There is some question as to the precise basis for this contention. It certainly cannot be one of file-wrapper estoppel. That doctrine binds the patentee to his claims as amended and prohibits reliance upon an original claim rejected by the Patent Office as the determinant of the scope of the patent. Ibid.; Morgan Envelope Co. v. Albany Perforated Wrapper Paper Co., 152 U.S. 425, 429, 14 S.Ct. 627, 38 L.Ed. 500 (1894). In all of the estoppel cases, however, it was the rejected claim upon which the patentee was attempting to rely. Here the plaintiff is relying on the claim as amended, i.e., the claim in the form which the patent examiner allowed. Estoppel therefore does not apply. Sales Affiliates v. Hutzler Bros. Co., 71 F. Supp. 287, 299-300 (D. Md. 1947).
As noted, the claim as originally submitted to the Patent Office made no mention of an intermediate guide plate. If, therefore, the accused machines contained merely upper and lower plates with no means between them for separating the sheets, defendant's contention would be persuasive. But the file-wrapper history is of no help to defendant where, as here, the accused machines come within the only reasonable construction of the language that was added to the claim. Rather than aiding defendant, the only relevant portion of the file wrapper supports the plaintiff's position. In a communication from Eisbein's attorney to the Patent Office in June 1952, it is stated that the purpose of the intermediate plate is "for preventing contact between the strips at least down to the level of the liquid." (Emphasis added) The sheets travel "down" to the liquid at the point where they enter it. At the level of the liquid where the sheets emerge, they are traveling "up."
In relation to file-wrapper history, defendant has argued that it was precluded by the trial court in cross-examining plaintiff's witnesses thereon and should therefore be afforded a new trial if there is to be a reversal. However, we have *552 examined the file wrapper and the supplemental briefs of both parties relating to its contents. As is evident from the preceding discussion, we have neither been directed to nor seen anything in the file wrapper that would be of material aid to defendant at a retrial.
Defendant has also introduced some patents issued subsequent to the patent in suit for the purpose of fortifying its contention that the Eisbein patent calls for an intermediate plate which extends to the rollers. Aside from the apparent novelty of such use of subsequent art for purposes of construction, these patents do not point to the argued construction of this patent.
The first of such subsequent patents is U.S. Patent No. 2,664,801, issued to Eisbein on January 5, 1954. Since the device disclosed by this patent contains extended intermediate plates, defendant argues that it evidences Eisbein's failure to perceive that shorter plates can be used. If he was unaware of this fact in 1954, it is argued, he was unaware of it in 1953 when the patent in suit was issued. The fallacy of this approach lies in the fact that the nature of the invention disclosed in the later patent required the extended intermediate plates. In No. 2,664,801, Eisbein contemplated guiding means which would keep the upper sheet dry until it met the moistened lower sheet at the rollers. The only way that this could be accomplished was to extend the intermediate plate to that point, i.e., the junction of the rollers. It does not follow from this that the extension was considered necessary in the earlier patent.
Contrary to defendant's implication, the invention disclosed by U.S. Patent No. 2,793,574, issued to one Unterberger on May 28, 1957, does not inhere in the use by that machine of an abbreviated intermediate plate, but rather lies in that inventor's use of rollers arranged so that their axes form an angle different from 90 degrees (which is the angle in the Eisbein machine) with respect to the feed direction of the photographic sheets.
*553 In summary, then, claim No. 1 of the Eisbein patent literally describes the accused machines except for one feature, the length of the upper guide plate.[3] In view of this conclusion we need not explore plaintiff's argument that defendant would be liable on the basis of the doctrine of equivalents, mentioned above, even if claim No. 1 were construed to require a full-length intermediate guide plate. And as to the adjudicated difference in relation to the length of the upper guide plate, we find this not legally material in relation to defendant's liability because of the effect thereon of the said doctrine of equivalents.
Plaintiff contends, and we agree, that even though the Ampto machines, to the extent indicated, avoid the literal impact of the wording of claim No. 1, they "perform substantially the same function in substantially the same way to obtain the same result," and thus are the equivalent of the patented device. See Sanitary Refrigerator Co. v. Winters, supra, 280 U.S., at p. 42, 50 S.Ct., at p. 9, 74 L.Ed. 147.
To determine the application here of the doctrine of equivalents, as thus authoritatively expressed, we must first consider the fundamental nature of the Eisbein invention. The patent in suit discloses a combination invention. Eisbein did not invent rigid guide plates, or rollers, or liquid-tight casings; the invention lies in the novel way in which he assembled *554 these familiar elements so as to produce a new and useful result. Copease Mfg. Co. v. American Photocopy Equipment Co., supra, 298 F.2d, at pp. 781-782; and see, generally, Great Atlantic & Pacific Tea Co. v. Supermarket Equip. Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950).
The underlying rationale of the doctrine of equivalents was articulated in Graver Tank & Mfg. Co. v. Linde Air Products Co., supra, 339 U.S., at pp. 607-608, 70 S.Ct., at p. 856, 94 L.Ed. 1097:
"* * * [C]ourts have * * * recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for  indeed encourage  the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law. One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It would deprive him of the benefit of his invention and would foster concealment rather than disclosure of inventions, which is one of the primary purposes of the patent system.
The doctrine of equivalents evolved in response to this experience."
The doctrine of equivalents is applicable to combination patents, Graver Tank & Mfg. Co. v. Linde Air Products Co., supra, whether an accused device adds (Hayes Spray Gun Co. v. E.C. Brown Co., 291 F.2d 319, 326 (9 Cir. 1961); 3 Walker, op. cit., § 460, p. 1693), improves (Gould v. Rees, 15 Wall. 187, 82 U.S. 187, 192, 21 L.Ed. 39 (1872); Temco Electric Motor Co. v. Apco Mfg. Co., 275 U.S. 319, 328, 48 S.Ct. 170, 72 L.Ed. 298 (1928); 3 Walker, op. cit., § 459, p. 1691), or replaces an element of the combination (Baldwin Rubber Co. v. Paine & Williams Co., 99 F.2d 1, 5 (6 Cir. 1938); 3 Walker, op. cit., § 464, p. 1700).
In determining whether the patented and accused machines are equivalents even though the upper guide plate used in the latter is relatively one-half the length of that of the Eisbein *555 device, we need not hesitate in an affirmative response to the question of whether the machines "do substantially the same work" or "performs substantially the same function." Sanitary Refrigerator Co. v. Winters, supra, 280 U.S., at p. 42, 50 S.Ct., at p. 13, 74 L.Ed. 147. They are both designed to and in fact execute the diffusion-transfer-reversal process of photocopying.
Next, do the respective machines accomplish the same result? Ibid. [Court discusses an asserted difference in result between the Agfa and Eisbein machines and concludes it is insubstantial.]
Having concluded that the machines do substantially the same work and achieve the same results, the remaining question is whether this is done in substantially the same way. Sanitary Refrigerator Co. v. Winters, supra, 280 U.S., at p. 42, 50 S.Ct. 9, 74 L.Ed. 147. More specifically, does the abbreviated upper guide plate of the Ampto machine perform its function in a substantially different manner from that of the Eisbein device? [Court discusses asserted difference in function of respective upper guides and concludes they perform their function in substantially the same manner in both machines.]
It has been seen, then, that the accused Ampto machines utilize every element of inventive difference over prior art (Agfa machine) disclosed by the Eisbein patent. They employ only one set of rollers, subject the sheets to the pressure of the rollers only after passage of the sheets through the liquid, work under the principle that a single line of pressure at the point of tangency of the one set of rollers is sufficient to carry out the Rott diffusion-transfer process, and make use of the rigid plates to guide the photographic sheets through the liquid in the machines. Like those of the Eisbein machine, these guiding means in the Ampto machines are comprised of a lower guide plate which is the principal guiding element forming the curve along which both sheets ultimately travel, an intermediate guide plate which keeps the sheets apart until their inner surfaces have been moistened *556 by the liquid, and an upper guide plate which counteracts the pull of the rollers to keep the upper sheet below the level of the liquid.
All that defendant has done in its machines is to eliminate an unnecessary extension of the upper guide plate. It has not demonstrated any benefit to be derived from this change, except, perhaps, greater economy in the use of material in the production of the machines. Defense counsel admitted at the trial that this factor is of no significance in this litigation. While the upper plate in the Ampto machine does force the sheets together at the low point of the curve of the lower plate, this result is also accomplished in plaintiff's machine even with the extended upper plate and, as observed above, would occur in defendant's machine even without the downward projection of the lead edge of its upper plate. It has thus been seen that no difference in result obtains because of this difference in one detail of construction.
Defendant can be said to have merely made an inconsequential alteration of one of the elements of Eisbein's combination invention. Gould v. Rees, supra, 15 Wall., at p. 192, 82 U.S., at p. 192, 21 L.Ed. 39; United States Rubber Co. v. General Tire & Rubber Co., 128 F.2d 104, 109 (6 Cir. 1942). Under the cited cases, this type of change is insufficient to avoid application of the doctrine of equivalents. It is the type of "unimportant and insubstantial change" which gave rise to that doctrine. Graver Tank & Mfg. Co. v. Linde Air Products Co., supra, 339 U.S., at p. 607, 70 S.Ct. 854, 94 L.Ed. 1097.
"A finding of equivalence is a determination of fact." Id., 339 U.S., at p. 609, 70 S.Ct., at p. 857, 94 L.Ed. 1097. In the exercise of our original jurisdiction, R.R. 1:5-4(b) and R.R. 2:5, we find that the Ampto 9 and Ampto 14 photocopy machines, taken as a whole, are the equivalent of the device disclosed in claim No. 1 of U.S. Patent No. 2,657,618.
Plaintiff has contended that it is entitled to a liberal application of the doctrine of equivalents because Eisbein's invention *557 constituted a substantial advance in the art of photocopy machines. Oates v. Camp, 83 F.2d 111, 115 (4 Cir. 1936). In support of the premise of this argument, plaintiff relies on the finding of the court in Copease Mfg. Co. v. American Photocopy Equipment Co., supra, 298 F.2d, at p. 782, that Eisbein succeeded "where others failed" in that "he took the diffusion process out of the laboratory and made it available on a practical basis for use in offices." Although for lack of relevant proof we cannot on this record make as unequivocal a finding as did the Seventh Circuit Court of Appeals in Copease as to the degree of practical advance in the art accomplished by Eisbein, defendant does not controvert plaintiff's assertion in that regard. However, we need not quibble over the degree of liberality with which the doctrine of equivalents should be here applied. Under any reasonable application of that doctrine, the difference in length between the upper guide plates in the patented and defendant's machines is insubstantial and the machines are equivalents.
We also find that the accused machines "infringe" claim No. 5, the remaining independent claim of the Eisbein patent. This claim reads as follows:
"5. A device for developing reproductions of the character described which comprises a casing for holding developer liquid, an opening in said casing above the level of the liquid for the insertion of sheet material to be treated, a set of rollers comprising at least one pair of contacting rollers within said casing and a plurality of spaced fixed substantially parallel guiding means forming at least two superposed curved slide ways communicating with said liquid leading from said opening to under the surface of the liquid and then to the set of rollers for feeding at least two sheets of material inserted into the opening simultaneously and in superposed relationship through the liquid and then to the set of rollers, said guideways including means extending between and separating strips therewithin during at least a part of their travel therethrough."
Defendant contends that its machines do not come within this language for two reasons: (1) the Ampto guide plates are not "substantially parallel"; (2) the Ampto intermediate plate does not extend to the nip of the rollers as, it is submitted, this language contemplates. [Court rejects defendant's *558 argument that substantial parallelism in Ampto machine is disproved by fact of better alignment of sheets with use of that machine.]
Even were it assumed, arguendo, that the Ampto machine is an improvement over that envisaged by the Eisbein patent in respect of the more exact alignment of the sheets assertedly obtained with the former, this would not promote the defense of this action. An accused device does not avoid a patent merely because it has improved the invention disclosed therein. Temco Electric Motor Co. v. Apco Mfg. Co., supra, 275 U.S., at p. 328, 48 S.Ct. 170, 72 L.Ed. 298. The test is whether a new and different combination has been formed. See Aluminum Co. of America v. Thompson Products, 122 F.2d 796, 799 (6 Cir. 1941); Chesapeake & O. Ry. Co. v. Kaltenbach, 95 F.2d 801, 804 (4 Cir. 1938).
It has been seen in the discussion of claim No. 1 that the machines involved in this litigation utilize the same combination of elements. As stated in Hoyt v. Horne, 145 U.S. 302, 309, 12 S.Ct. 922, 924, 36 L.Ed. 713 (1892): "Defendant's [device] may be in [one] particular an improvement upon the other; but [defendant] has nonetheless succeeded in appropriating all that was of value in the [plaintiff's] device." In other words, if defendant has improved one element of Eisbein's invention, it is nevertheless still Eisbein's invention. The extent of any such improvement is not material in that state of the law; it can amount to patentable invention and still come within the scope of the Eisbein patent. Cantrell v. Wallick, 117 U.S. 689, 694, 6 S.Ct. 970, 29 L.Ed. 1017 (1886); Aluminum Company of America v. Sperry Products, Inc., 285 F.2d 911, 923-925 (6 Cir. 1960). What is significant is that the improved device still embodies the Eisbein invention.
As noted above, defendant's second contention in respect of the plaintiff's assertion of coverage under claim No. 5 is that the claim calls for an intermediate guide plate which extends to the point of tangency of the rollers and keeps the sheets apart throughout their entire passage through the processing *559 solution. This argument is based on the following language of the claim: "* * * [said device containing] guiding means forming at least two superposed curved slideways communicating with said liquid leading from said opening [in the casing] to under the surface of the liquid and then to the set of rollers * * *."
Defendant points out that a "slideway" is formed by an intermediate and upper (or lower) plate, and argues that since a "slideway" must lead from the opening in the casing to the rollers under this language of the claim, the intermediate plate must also extend that far since it is an integral component of the "slideway."
Preliminarily, the argument overlooks the last clause of claim No. 5: "said guideways including means extending between and separating strips [i.e., photographic sheets] therewithin during at least a part of their travel therethrough." (Emphasis added) This language requires only that there be an intermediate plate separating the sheets "during at least a part of their travel" to the rollers; in other words, the intermediate plate need not extend to the rollers. Defendant does argue that this language should be construed to mean the point where the sheets leave the liquid, but, as has been seen under the discussion of claim No. 1, this would make Eisbein's use of the words "at least" meaningless.
Granting, then, that the "at least" clause of claim No. 5 contemplates use of an abbreviated intermediate plate, that is not a complete answer to defendant's position. Such a construction would do no more than raise a contradiction with defendant's construction of that portion of the claim describing the "slideways."
But the problem is resolved when it is seen that defendant's construction of the "slideways" clause of claim No. 5 cannot withstand analysis. Defendant asserts in its brief:
"Claim 5 calls for `a plurality of spaced fixed substantially parallel guiding means forming at least two superposed curved slide ways communicating with said liquid leading from said opening to under the surface of the liquid and then to the set of rollers.' As appears *560 in the discussion of Claim 1, defendant's machines do not utilize guide means which form such superposed slide ways extending the full distance from the inlet opening, through the processing solution and to the set of rollers." (Emphasis added)
It is significant that defendant's argument substitutes "extending" for "leading" in construing the claim language. The difference between these words, however, is material, and it points the way toward a more harmonious interpretation of claim No. 5 than that offered by defendant.
The word "leading," properly used, does not describe the physical characteristics of an object doing the leading, but rather a directional relationship between that object and something else. To "lead" is to "guide or conduct in a certain course, or to a certain place or end." Webster's New International Dictionary (2d ed. 1959). In this sense, "leading" is quite distinguishable from "extending." To apply the word "extending" to an object is to describe its physical length, as we did in our discussion of claim No. 1 where the conclusion was reached that the upper guide plate was intended to reach the rollers since it was described as "extending" to that point. The "slideways" of defendant's machines do not physically extend to the rollers, but that is not what is required by claim No. 5. As a unit, they lead down through the liquid and up to the rollers, i.e., they conduct or direct the photographic sheets over the course described in the claim.
Further language of the claim points to the same result. It is there recited that the slideways must "communicat[e] with said liquid leading * * * to the set of rollers," i.e., extend to the liquid from the opening in the casing and then lead to the rollers. It is strongly inferable that "communicate" and "lead" do not hold the same meaning for the patentee in this context. It can be further observed that immediately following the description of where the slideways must lead, Eisbein explains that this is "for feeding at least two sheets of material inserted into the opening * * * through the liquid and then to the set of rollers." This language gives further support to the concept that "leading" was used to *561 describe the function of the slideways in guiding the course of the sheets and not as a term describing their physical length. Moreover, as seen, if defendant's construction of the clause describing "slideways" is accepted, the last clause of the claim becomes either meaningless or contradictory and of no effect. Such a construction is to be avoided. Harris v. Ladd, 34 F.2d 761, 763 (8 Cir. 1929); Mall Tool Co. v. Quaker Vibrators, 29 F. Supp. 718, 719 (E.D. Pa. 1939).
Our conclusion, then, is that the Ampto machines introduced into evidence below come within the coverage of both of the independent claims No. 1 and No. 5 of the Eisbein patent in suit and thus "embody the inventions" of that patent. Defendant is liable for royalties under the agreement. The cause is reversed and remanded to the Chancery Division for an accounting of damages consistent with the views expressed herein. On the accounting the court will consider and determine the merits of defendant's contention that plaintiff received compensation for the sale of some of the machines involved here in the damages it recovered under the American Photocopy Equipment Company v. Speed-O-Print Corp. consent decree.
Judgment reversed with directions for entry of interlocutory judgment of liability for plaintiff.
NOTES
[1] The nature of the chemical reactions producing the transfer is concisely explained in Copease Mfg. Co. v. American Photocopy Equipment Co., supra, 298 F.2d, at p. 774, n. 4.
[2] While the issue of the validity of the Eisbein patent is not of direct significance here, it is interesting to note that two courts, on more complete records than that provided the court in this case, have held that the Eisbein patent displays invention over prior art, including the Agfa machine. Copease Mfg. Co. v. American Photocopy Equipment Co., supra, 298 F.2d, at p. 782; Lumoprint-Zindler K.G. v. Boeger (First Court of Civil Law of the Supreme Court (West Germany), November 1962).
[3] Defendant points out, but does not press, two minor distinctions between claim No. 1 and one of the accused machines, the Ampto 9. The claim reads: "Said device comprising a casing adapted to hold the developer liquid therein at a given level." In Ampto 9, the developer liquid is held, not in the casing, but in a removable tray. This difference is of no consequence, however. As was said in Copease Mfg. Co. v. American Photocopy Equipment Co., supra, 189 F. Supp., at pp. 545-546): "Defendants have merely divided into two parts that which the patent discloses as being made in a single part, without any substantial change in the function of the machines." The claim also reads: "[said device containing] an arrangement of contacting rollers within the casing." In Ampto 9, the rollers are mounted within the casing of the machine, but not within a casing "adapted to hold the developer liquid," etc. Spatially and functionally, however, the rollers in Ampto 9 are the same as those called for by the patient in suit.