IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| COMPOSECURE, L.L.C., | § | |
| | § | |
| Plaintiff/Counterclaim | § | |
| Defendant-Below/Appellant, | § | No. 177, 2018 |
| | § | |
| v. | § | Court Below: |
| | § | Chancery Court of the |
| CARDUX, LLC f/k/a AFFLUENT | § | State of Delaware |
| CARD, LLC, | § | |
| | § | C.A. No. 12524-VCL |
| Defendant/Counterclaim | § | |
| Plaintiff-Below/Appellee. | § | |

Submitted: October 10, 2018
Decided: November 7, 2018

Before **VALIHURA**, **VAUGHN** and **SEITZ**, Justices.

Upon appeal from the Court of Chancery. **AFFIRMED** in part, **REVERSED** in part and **REMANDED** with jurisdiction retained.

Myron T. Steele, Esquire, Arthur L. Dent, Esquire, *(argued)*, Andrew H. Sauder, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware. Of Counsel: Steven M. Coren, Esquire, David M. DeVito, Esquire, Kaufman, Coren & Ress, P.C., Philadelphia, Pennsylvania for Appellants.

David J. Margules, Esquire, *(argued)*, Elizabeth A. Sloan, Esquire, Jessica C. Watt, Esquire, Ballard Spahr LLP, Wilmington, Delaware; Burt M. Rublin, Esquire, Ballard Spahr LLP, Philadelphia, Pennsylvania for Appellees.

**VALIHURA**, Justice:

Appellant CompoSecure, L.L.C. ("CompoSecure") appeals from a nearly $17 million judgment in the Court of Chancery for past-due commissions, legal fees and expenses, pre-judgment interest, and contract damages arising out of a sales agreement (the "Sales Agreement") with Appellee CardUX, LLC ("CardUX"). On appeal, CompoSecure contends that the Court of Chancery erred by holding that (1) the Sales Agreement was voidable, not void, under CompoSecure's Amended and Restated Limited Liability Company Agreement (the "LLC Agreement"), and (2) CompoSecure impliedly ratified the Sales Agreement. CardUX argues that, even if CompoSecure were correct, we should enforce the Sales Agreement based on a provision in the LLC Agreement that addresses reliance by third parties on certain company actions, or based upon *quantum meruit*.

While he was a CompoSecure director, Kevin Kleinschmidt co-founded CardUX for the purpose of marketing on CompoSecure's behalf. CompoSecure hired CardUX to promote and sell its metal cards. To govern their relationship, CompoSecure and CardUX entered into the detailed Sales Agreement. Because it is a conflicted transaction, the Sales Agreement is subject to Section 5.4 of the LLC Agreement (the "Related Party Provision"), which requires approval from the Board, the Investors, and the Class A Majority.[1] On appeal, CompoSecure argues that the Sales Agreement is also subject to Section 4.1(p)(ix)(A) of the LLC Agreement (the "Restricted Activities Provision"). The Restricted Activities Provision contains an important clause, namely, that Restricted

---

[1] App. to Opening Br. at A143.

Activities are "void and of no force or effect whatsoever" if they do not receive approvals from the Board, the Investors, and the Class A Majority.[2]   It is undisputed that CompoSecure did not obtain the approvals needed for compliance with either the Related Party or the Restricted Activities Provision.

Following four days of trial, the Court of Chancery held that the Related Party Provision applied to the Sales Agreement.   Because CompoSecure was capable of authorizing the Sales Agreement, even though it had failed to properly do so, the court held that it was a voidable transaction subject to equitable defenses.[3]  Applying New Jersey law, the Court of Chancery held that CompoSecure had impliedly ratified the Sales Agreement.[4]

We largely agree with the Court of Chancery's analysis as far as it goes.  However, the court considered the Related Party Provision and the Restricted Activities Provision to be cumulative.  Accordingly, the court only assumed, without deciding, that the Restricted Activities Provision applied.[5]  It did not separately consider, as a factual matter, whether the Sales Agreement falls within the Restricted Activities Provision, and it did not analyze whether the Sales Agreement was "void and of no force or effect whatsoever" in the event it did apply.  CompoSecure is partly to blame for the trial court's failure to focus on the impact of this provision as CompoSecure only weakly raised the issue below, but, on

---

[2] *Id.* at A139–40.

[3] *CompoSecure, L.L.C. v. CardUX, LLC*, 2018 WL 660178, at *27 (Del. Ch. Feb. 1, 2018) [hereinafter "*Chancery Opinion*"].

[4] *Id.* at *30.

[5] *Id.* at *12 n.162.

appeal, elevates the issue to its lead argument. Even so, after examining the record below, we decline to hold that the issue has been waived.

Whether the Sales Agreement falls within the Restricted Activities Provision requires factual findings that the Vice Chancellor is better equipped to make. The answer to this question is important because, if the Restricted Activities Provision applies, the Sales Agreement would be void, as opposed to merely voidable, and, therefore, would be incapable of being ratified. Accordingly, we will remand to allow the trial court to determine whether the Sales Agreement is a Restricted Activity and to make any necessary related determinations. We will retain jurisdiction.

We do so reluctantly, as the trial court made a persuasive case that the equities do not favor CompoSecure. CompoSecure admitted at oral argument that the Sales Agreement was a "bad contract,"[6] and the Vice Chancellor's opinion is rife with findings suggesting that CompoSecure consistently attempted to avoid its obligations under that agreement.[7] Nevertheless, we agree with the parties that, if it applies, the Restricted Activities Provision would render the Sales Agreement void.

---

[6] Oral Argument video at 19:51–19:59, https://livestream.com/DelawareSupremeCourt/events/8406617/videos/181563924 ("The other side's case is all about how CompoSecure is trying to get out of a bad contract. It was a bad contract."). Nevertheless, it is our role to enforce the parties' bargained for allocation of risks and opportunities. *See Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) ("Parties have a right to enter into good and bad contracts, the law enforces both."); *see also DeLucca v. KKAT Mgmt., L.L.C.*, 2006 WL 224058, at *2 (Del. Ch. Jan. 23, 2006) ("[I]t is not the job of a court to relieve sophisticated parties of the burdens of contracts they wish they had drafted differently but in fact did not. Rather, it is the court's job to enforce the clear terms of contracts.").

[7] For example, the Vice Chancellor found that CompoSecure officials complained about the high commissions immediately after learning of the Amazon deal, asked Kleinschmidt to take a lower commission on multiple occasions, proposed not paying any commissions or simply letting

4

In the event the trial court concludes that the Restricted Activities Provision does not apply, to be as helpful as possible and to narrow the potential issues going forward, we have considered the parties remaining arguments on appeal. As to those issues, we find no error and affirm the Vice Chancellor's conclusions. In particular, we agree with the Court of Chancery's conclusions that: (1) the Related Party Provision (leaving aside the Restricted Activities Provision) renders the Sales Agreement voidable, not void, and is therefore subject to equitable defenses; (2) the parties impliedly ratified the Sales Agreement under New Jersey law; and (3) the Third Party Reliance Provision (described below) does not save the Sales Agreement from a failure to comply with the Related Party or Restricted Activities Provisions.

Accordingly, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion.

## I. Background

### A. CompoSecure's Founding and Outside Financing

In 2000, Michelle Logan and her father, John Herslow, co-founded CompoSecure to manufacture and sell metal and composite credit cards.[8] Logan took over the business

---

CardUX try to sue them, admitted at trial that they tried to conjure up reasons to invalidate the Sales Agreement, and suggested that CompoSecure withhold its cooperation from CardUX's marketing efforts until it could renegotiate more favorable terms. *Chancery Opinion*, 2018 WL 660178, at *15–17. The Vice Chancellor was critical of CompoSecure's executive's testimony and found, on more than one occasion, that Michelle Logan's testimony "did not hang together," and that Kleinschmidt's, by contrast, "was credible." *Id.* at *16 n.213. At trial, CompoSecure's co-founder, John Herslow, admitted that his coercion claim was baseless, and Logan admitted that her claim that LLR had forced her to accept the Sales Agreement was false. *Id.* at *16.

[8] Because the parties have not challenged the trial court's factual findings on appeal, we rely on the trial court's findings in setting forth the background relevant to the issues on appeal. *See*

5

in 2004 and became CEO in 2012.[9] CompoSecure is one of the only companies in the business of manufacturing metal cards. It manufactures the cards at a high cost and markets them to affluent customers through initiatives like the JP Morgan Chase ("Chase") Sapphire Card program.[10] CompoSecure also sells cards at a fifteen percent discount to "personalization partners," who buy metal cards, add personalized details, and sell them to issuing banks.

In 2013, CompoSecure's owners began exploring a potential sale of CompoSecure. One interested investor was LLR Partners ("LLR"), a private equity firm. Mitchell Hollin led LLR's investment in CompoSecure and recruited Kleinschmidt, a former credit card executive, to help with LLR's due diligence. Kleinschmidt had experience with so-called co-brand relationships, in which an issuing bank partners with an entity, such as an airline, to create specialized cards that bear the mark of both the issuing bank and the partner. In his evaluation, Kleinschmidt flagged several concerns regarding CompoSecure, including its heavy reliance on Chase, small sales staff, lack of established relationships with key decision-makers at issuing banks, and lack of a strategy to educate co-brand partners about metal cards.

---

Opening Br. at 4 ("Although CompoSecure disagrees with many of the trial court's factual findings regarding the interpretation of the Sales Agreement, this appeal challenges only the trial court's holding that the Sales Agreement was a valid and binding contract.").

[9] *Chancery Opinion*, 2018 WL 660178, at *2.

[10] Chase comprised about seventy-five percent of CompoSecure's revenue in 2013, which concentrated business and created multiple layers of risk for CompoSecure.

6

On May 11, 2015, LLR purchased sixty percent of CompoSecure's equity for $100 million. At Hollin's request, Kleinschmidt agreed to serve as a member of the Board. As a part of the transaction, CompoSecure converted from a New Jersey LLC to a Delaware LLC. Immediately after closing, the Board consisted of LLR designees Kleinschmidt, Hollin, and Justin Reger, and Class A designees Logan and Herslow. All of CompoSecure's post-transaction Board members, including Kleinschmidt, signed the LLC Agreement.[11]

## B. Kleinschmidt and Frantz form CardUX

In the months preceding LLR's May 11, 2015 investment in CompoSecure, Kleinschmidt and another former credit card executive, Paul Frantz, formulated a plan to boost sales for CompoSecure. To accomplish this objective, they contemplated a separate entity that would focus on convincing co-brand partners to demand metal cards from their partnering banks. That entity became CardUX.[12] In March 2015, Kleinschmidt proposed this marketing strategy to Hollin, who liked the idea, and raised it with Logan, who also thought it was a "good idea."[13]

After negotiations concerning the commission rate and the marketing efforts required of CardUX, the parties tentatively agreed to a flat fifteen percent commission for any order by an approved prospect and perpetual commissions for subsequent orders from

---

[11] *See Chancery Opinion*, 2018 WL 660178, at *25 n.297 ("Before LLR's investment closed, Kleinschmidt executed the signature page for the LLC Agreement.").

[12] CardUX was formerly called Affluent Card, LLC.

[13] *Chancery Opinion*, 2018 WL 660178, at *5.

7

the same customers as long as CardUX was "meaningfully involved" in the order.[14]  The term sheet did not include any requirement that CardUX show that its efforts led directly to a particular sale, and the Vice Chancellor found that "[t]he concept of being 'meaningfully involved' did not apply to initial commission."[15]  Rather, "[i]t applied to continuing commissions for subsequent orders from the same customer."[16]  In a July 1, 2015 meeting, CompoSecure's Board members evaluated and generally expressed support for that plan, but did not cast a formal vote.[17]

Shortly after the July 2015 meeting, Hollin took over negotiations for CompoSecure because Logan's mother had been diagnosed with terminal cancer.  As negotiations progressed, CardUX objected to CompoSecure's insistence on "efforts" clauses, which limited CardUX's commissions to sales resulting from CardUX's marketing efforts, and to limitations on the length of time it would be entitled to commissions.[18]  Hollin did not object to Kleinschmidt's deletion of the efforts requirement.  He did push back on paying commissions "forever and unconditionally," and the parties compromised on that point by agreeing that CardUX would receive commissions for a period of fifteen years.

---

[14] *Id.* at *7–8.

[15] *Id.* at *7.

[16] *Id.*

[17] *Id.* at *8, *13.  This Board included Reger, who had been replaced by Phillippe Tartavull by the time the parties executed the Sales Agreement.

[18] *Id.* at *8–10.

8

*C. CompoSecure and CardUX Sign the Sales Agreement without the Required Approvals*

Following further negotiations, on November 4, 2015, an execution version of the proposed sales agreement was circulated among the parties. The parties executed the Sales Agreement on November 9, 2015, with Logan signing as CEO for CompoSecure and Kleinschmidt signing for CardUX.[19] Although both were CompoSecure directors, they did not obtain any of the approvals required by the Related Party Provision contained in Section 5.4 of the LLC Agreement, which provides:

> Section 5.4    Transactions Between the Company and the Members. Notwithstanding that it may constitute a conflict of interest, each of the Members, the members of the Board and their respective Affiliates, or any other Related Party, may engage in any transaction or other arrangement (including the purchase, sale, lease or exchange of any property or the rendering of any service or the establishment of any salary, other compensation or other terms of employment), whether formal or informal, with the Company (and/or any of its Subsidiaries), *and the Company may engage in any such transaction, only if such transaction is at arm's length and approved by the Board, the Investors and the Class A Majority*. The Company shall not, and shall cause its Subsidiaries to not, enter into, amend, alter or otherwise modify such agreements unless such amendment, alteration or modification is at arm's length and approved by the Board, the Investors and the Class A Majority.[20]

In this case, the Related Party Provision applies to the Sales Agreement because CardUX is an Affiliate of Kleinschmidt, who was a member of the CompoSecure Board.[21]

---

[19] App. to Opening Br. at A217.

[20] *Id.* at A143 (emphasis added).

[21] *Chancery Opinion*, 2018 WL 660178, at \*23. The LLC Agreement defines an "Affiliate" of any person "that is not a natural person" to mean "any other Person controlling, controlled by, or under common control with such particular Person, where 'control' means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise . . . ." App. to Opening Br. at A119.

Further, although the parties dispute whether it applies, the Restricted Activities Provision, contained in Section 4.1(p) of the LLC Agreement, similarly requires approval of certain Restricted Activities by "[t]he Board and Investors (and during the Earnout Period, the Class A Majority)." It also defines Restricted Activities and sets forth the consequences of failing to obtain those approvals:

> (p) <u>Restricted Activities.</u> In the third or fourth quarter of each fiscal year (and in any event by December 31 of such year), the Board shall enact an annual budget and annual business plan for the Company and its Subsidiaries for the following fiscal year, which budget and business plan shall be subject to approval by the Investors and the Class A Majority. The annual budget for each fiscal year shall include all material anticipated expenditures, including with respect to compensation (including incentive compensation, bonuses payable and bonus opportunities for that fiscal year), new hires, marketing costs, and commissions and other amounts payable to vendors and other contractors as well as budgeted EBITDA for that fiscal year. *Except as set forth in such annual budget or annual business plan previously approved by the Investors and the Class A Majority, neither the Company nor any of its Subsidiaries shall undertake, nor shall agree to undertake, any of the following actions without the prior approval of the Board and Investors (and during the Earnout Period, the Class A Majority),* ***and any action taken in contravention of the foregoing shall be void and of no force or effect whatsoever:***
>
> . . . .
>
> (ix)(A) enter into, terminate or amend any contract, agreement, arrangement or understanding requiring the Company or any of its Subsidiaries to make expenditures in excess of $500,000 during any fiscal year, other than in the ordinary course of business consistent with past practice . . . .[22]

---

[22] App. to Opening Br. at A139–40 (emphasis added).

Thus, a transaction requiring expenses in excess of $500,000 during any fiscal year and not in CompoSecure's ordinary course of business is "void and of no force or effect whatsoever," absent the requisite approvals.

The Board never formally approved the Sales Agreement, though the Board met and discussed it in July and December 2015. Further, the "Investors"—the funds managed by LLR that held CompoSecure units—did not formally approve the Sales Agreement either, though Hollin (an LLR partner and its representative on the Board) supported the Sales Agreement.[23] Finally, Logan, who held the Class A Majority, signed the agreement in her capacity as CEO, but the record does not contain a written document, executed by Logan, reciting that the Class A Majority approved the Sales Agreement for the purpose of the LLC Agreement. Given the absence of those formal approvals, CompoSecure argues on appeal that the Sales Agreement is void.[24]

Despite the lack of formal approvals, at least three of the four disinterested Board members—Logan, Herslow, and Hollin—believed that Logan had the authority to bind CompoSecure to the Sales Agreement. In fact, Section 11 of the LLC Agreement contained representations and warranties that the Sales Agreement had been properly authorized and executed. In commenting on the executed version, the Vice Chancellor found that, "[a]fter

---

[23] *Chancery Opinion*, 2018 WL 660178, at *13. In this regard, the trial court found that "Hollin represented the LLR funds and supported the Sales Agreement, but the record does not contain a written document, executed by a representative of LLR, reciting that LLR had approved the Sales Agreement for the purpose of the LLC Agreement." *Id.*

[24] *See* Opening Br. at 5, 25; Reply Br. at 15–16.

11

the parties signed the Sales Agreement, both sides treated it as valid."[25]  He also found that "[t]he Sales Agreement did not contain any provisions conditioning CardUX's receipt of a commission on a link between its efforts and the sale."[26]

### D.  The Amazon Sale and CompoSecure's Refusal to Pay Commissions

After executing the Sales Agreement, CardUX began its marketing efforts with at least forty-eight approved prospects—including Amazon.  Unbeknownst to CardUX, Amazon had already issued a request for a proposal for metal cards from its potential co-branding partners: Bank of America or Chase.  In response to that news, Logan acknowledged, in an email to Hollin, the possibility of enormous commissions for CardUX: "Yikes.  [Kleinschmidt] and [Frantz] would get 15%."[27]  Logan also lamented to Hollin that CompoSecure "didn't insist on a lower commission," and Hollin replied that CompoSecure should "live with the deal as agreed."[28]  Although CompoSecure enlisted CardUX's help in steering the business to Bank of America, Amazon had already agreed to a partnership with Chase by the time CardUX met with Amazon representatives.[29]

After CompoSecure finalized the Amazon order in January 2016, Logan asked Kleinschmidt to consider taking a lower commission.  Kleinschmidt refused and

---

[25] *Chancery Opinion*, 2018 WL 660178, at *13.

[26] *Id.* at *11.

[27] *Id.* at *15, *35.

[28] *Id.*

[29] The trial court found that "[t]he evidence at trial established that CardUX's efforts did not contribute to Amazon's request for metal cards," and that "Amazon first demanded metal cards in October 2015, before CardUX started pursuing Amazon." *Id.* at *15.

12

maintained that CardUX was entitled to a commission under the Sales Agreement. Without paying any Amazon commissions to CardUX, CompoSecure removed Kleinschmidt from the Board in May 2016 and hired litigation counsel who, for the first time, asserted that CompoSecure had not properly authorized the Sales Agreement under the Related Party and Restricted Activities Provisions.[30] Before the dispute over the Amazon Sale, Hollin and Logan had never questioned the validity of the Sales Agreement.

CompoSecure sought a declaratory judgment in the Court of Chancery that the Sales Agreement was invalid. CardUX counterclaimed for breach of contract, alleging that CompoSecure owed it a commission for the Amazon Sale and alleging that CompoSecure failed to use commercially reasonable efforts to support CardUX's sales activity. Following a four-day trial in February 2018, the Court of Chancery held that the Sales Agreement was voidable because CompoSecure had not complied with the Related Party Provision's approval requirements contained in the LLC Agreement, but held the Sales Agreement to be enforceable, nonetheless, because it had been impliedly ratified. It held that CardUX was entitled to a commission under the plain language of the Sales Agreement, which did not require any link between CardUX's efforts and a particular sale to an "approved prospect" (as defined in the Sales Agreement).

Shifting its "dominant narrative" in the proceedings below, which centered on the Related Party Provision, CompoSecure's central argument on appeal is that, under the Restricted Activities Provision, failure to obtain prior approval of the Sales Agreement

---

[30] *Id.* at *16–18.

13

renders the Sales Agreement void, as opposed to voidable, and as such, incapable of being ratified.[31] It also contends that the trial court erred in holding that CompoSecure ratified its failure to comply with the Related Party Provision.

## II. Analysis

### A. Standard of Review

This Court "will uphold the trial court's factual findings unless they are clearly erroneous."[32] We review questions of law and contractual interpretation, including the interpretation of LLC agreements, *de novo*.[33] Since the parties do not challenge the relevant factual findings on appeal, the issues before us involve legal questions or issues of contractual interpretation, which we review *de novo*.

### B. The Restricted Activities Provision Is Not Merely "Cumulative"

Although the Court of Chancery's analysis is correct as far as it goes, it did not consider whether the Sales Agreement is a "Restricted Activity," nor did it attempt to address whether the Sales Agreement would be "void and of no force or effect whatsoever" if it were a Restricted Activity. Unfortunately, the answer to this question could be a game-changer, as even CardUX's counsel candidly acknowledged at oral argument.[34]

---

[31] The trial court stated at the outset of its legal analysis that, "[f]or CompoSecure, the dominant narrative involves its own failure to comply with the Related Party Provision, which renders the Sales Agreement invalid and any breach irrelevant." *Chancery Opinion*, 2018 WL 660178, at *19.

[32] *Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1212 (Del. 2012).

[33] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010) (citing *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396 (Del. 2010)); *see also Gatz*, 59 A.3d at 1212.

[34] Oral Argument video at 37:23–37:38, https://livestream.com/DelawareSupremeCourt/events/8406617/videos/181563924 ("I think the contract overrules Delaware law. I think that if there's a violation of the contract under [Section]

We agree that, if the Restricted Activities Provision were to apply, the plain language of the provision would render the Sales Agreement void, and therefore incapable of being ratified. The common law rule is that void acts are *ultra vires* and generally cannot be ratified, but voidable acts are acts falling within the power of a corporation, though not properly authorized, and are subject to equitable defenses. [35] Ordinarily, the Sales Agreement would be voidable for failure to comply with the Restricted Activities Provision.[36] But, given the plain language of the Restricted Activities Provision—"void and of no force or effect whatsoever"—its application would trump the common law rule and render the Sales Agreement void and incapable of being ratified.

As a preliminary matter, the parties dispute whether the Sales Agreement was a Restricted Activity. To qualify as such, the Sales Agreement must be a transaction

---

4.1(p), assuming it's a covered transaction, it's void. Now, that's not the end of the question. But I read the contract the way [CompoSecure] read[s] it."). The Court appreciates counsel's candor, which is consistent with our high expectations for, and traditions of our Bar.

[35] *See Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1046 (Del. 2014) (addressing appellant's equitable claim that he was improperly removed as CEO and stating that "board action taken in violation of equitable principles is voidable, not void, because '[o]nly voidable acts are susceptible to . . . equitable defenses'" (quoting *Boris v. Schaheen*, 2013 WL 6331287, at *15 (Del. Ch. Dec. 2, 2013))); *Nevins v. Bryan*, 885 A.2d 233, 245 (Del. Ch.) ("Void acts are not ratifiable because the corporation cannot, in any case, lawfully accomplish them. Void acts are illegal acts or acts beyond the authority of the corporation. In contrast, voidable acts are ratifiable because the corporation can lawfully accomplish them if it does so in the appropriate manner." (internal quotations and citations omitted)), *aff'd*, 884 A.2d 512 (Del. 2005).

[36] The LLC Act grants broad authority to Delaware LLCs, which have "such powers and privileges as are necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the limited liability company." 6 *Del. C.* § 18-106(b). The powers "necessary or convenient to" the business of an LLC include the ability to enter into contracts. Section 18-107 of the LLC Act grants LLCs the power to enter into interested transactions. The LLC Agreement implements these grants of authority. *See* App. to Opening Br. at A129, A143 (Sections 2.6 and 5.4 of the LLC Agreement, respectively).

"requiring the Company or any of its Subsidiaries to make expenditures in excess of $500,000 during any fiscal year, other than in the ordinary course of business consistent with past practice."[37] CardUX argues that the Sales Agreement is not a Restricted Activity for various reasons, including that the Sales Agreement was in the "ordinary course" of CompoSecure's business and it did not "require" $500,000 per year in expenditures. Further, CardUX contends that CompoSecure did not fairly present its Restricted Activities argument to the Court of Chancery. CompoSecure argues that the Sales Agreement is a Restricted Activity because the court determined that CardUX is entitled to commissions well over the $500,000 threshold.[38]

We first dispense with CardUX's contention that the "void" argument was not fairly presented below. After reviewing the record, we agree that CompoSecure did not forcefully raise its argument below, but we find no waiver. CompoSecure did not expressly argue that the Restricted Activities Provision modifies the common law rule, but it did repeatedly state that the Sales Agreement was *void*, not voidable, and it distinguished the language of the Restricted Activities Provision in multiple instances. For example:

- CompoSecure describes the Sales Agreement as "*void* and unenforceable" three times in its Second Amended Complaint when referring to the Restricted Activities Provision.[39]

---

[37] App. to Opening Br. at A140.

[38] CompoSecure relies on facts post-dating the signing of the Sales Agreement—namely, the Amazon sale—as support for its argument that the Sales Agreement met the $500,000 threshold. CardUX, however, logically argues that the expenses required of the Sales Agreement must be viewed as of the time of the signing of the agreement. Under this approach, CardUX contends that the parties expected the Sales Agreement to result in less than $500,000 in commissions and expenses per year. We leave resolution of these issues to the Vice Chancellor on remand.

[39] App. to Reply Br. at AR1, AR 2, AR15 (emphasis added).

16

- The Second Amended Complaint quotes the Restricted Activities Provision and italicizes the words, "any action taken in contravention of the foregoing shall be void and of no force or effect whatsoever."[40]

- CompoSecure's Opening Pre-Trial Brief quotes the Restricted Activities Provision,[41] and it distinguishes between the Related Party and Restricted Activities Provisions: "Thus, as a conflicted transaction under Section 5.4, the SRA needed to receive the separate approvals of the Board, the Class A Majority and the Investors. *And as a Restricted Activity under Section 4.1(p)*, it also needed the same three-part approval, which had to be 'prior approval' or else the contract was *void*."[42]

- Section 1 of CompoSecure's Opening Pre-Trial Brief seeks a declaration that the Sales Agreement is "void" generally, but Section 1.A (discussing the Related Party Provision) does not use the term "void." Section 1.B (discussing the Restricted Activities Provision), however, explicitly quotes the void language.[43] Section 1.C makes the distinction even clearer: "Indeed, *Section 4.1(p) goes even further* with respect to 'Restricted Activities,' mandating '*prior* approval' and specifying the consequence of failure to obtain that approval: the contract 'shall be void and of no force or effect whatsoever.'"[44]

- CompoSecure's Post-Trial Answering Brief repeats its assertion that, under the Restricted Activities Provision, there "had to be 'prior approval' or else the contract [is] void."[45]

- CompoSecure's Post-Trial Answering Brief again points to the unique language in the Restricted Activities Provision: "Section 4.1(p) goes further, requiring '*prior* approval' for Restricted Activities, and specifying the consequence of failure to obtain that approval: the contract 'shall be void and of no force or effect whatsoever.'"[46] Later on the same page, CompoSecure

---

[40] *Id.* at AR9 (italics omitted).

[41] App. to Opening Br. at A319.

[42] *Id.* at A320 (emphasis added).

[43] *Id.* at A336–38.

[44] *Id.* at A338–39 (emphasis added).

[45] *Id.* at A849.

[46] *Id.* at A862–63.

states that, "under the plain language of the LLC Agreement and Delaware law, the SRA is void."[47]

Although CompoSecure now shines a much brighter light on the legal impact of the Restricted Activities Provision, and the question of whether it trumps the traditional common law rule, that legal question is implicit in CompoSecure's argument that the Sales Agreement is void by operation of that provision. As even the trial court acknowledged, "CompoSecure argues that the Sales Agreement also qualified as a 'Restricted Activity' under Section 4.1(p) of the LLC Agreement."[48] But perhaps the trial court overlooked the "void" language in concluding that Section 4.1(p) "was cumulative" of the Related Party Provision.[49] As a result, it merely assumed, without deciding, that the Restricted Activities Provision applied. Both sides now agree on appeal, as do we, that the "void" language is not cumulative. Because resolution of this issue could change the outcome, we remand for a determination as to whether the Sales Agreement is a Restricted Activity.

C. *Leaving Aside the Potential Impact of the "Void" Provision, We Find No Error*

Although, if applicable, the Restricted Activities Provision would render the Sales Agreement void, we resolve the remaining arguments on appeal in case the trial court determines otherwise. In sum, we find no error with any other aspect of the trial court's rulings challenged on appeal. We first address whether the court properly analyzed the

---

[47] *Id.* at A863.

[48] *Chancery Opinion*, 2018 WL 660178, at *12 n.162.

[49] *Id.*

18

issue of ratification, and then we turn to CardUX's argument that the Third Party Reliance Provision saves the Sales Agreement from any defect in its authorization.

CompoSecure argues that: (1) the law of Delaware, not New Jersey, governs all issues concerning its failure to comply with the Related Party Provision—including the issue of implied ratification; (2) because Kleinschmidt knowingly engaged in a conflicted transaction as a CompoSecure fiduciary, the Sales Agreement should be treated as void and incapable of being ratified; and (3), even if voidable, CompoSecure did not impliedly ratify the Sales Agreement because it did not comply with the strict formalities in the Related Party Provision. CardUX agrees with the Court of Chancery's determination that New Jersey law governs the issue of implied ratification and that, as a voidable transaction, CompoSecure impliedly ratified the Sales Agreement by treating it as a valid contract, accepting its benefits, and failing to disaffirm the Sales Agreement until six months after its execution.[50] Despite their disagreement as to what state's law governs resolution of this issue, both parties ultimately argue that their positions are supported by Delaware and New Jersey law.[51]

---

[50] *See id.* at *27–30.

[51] The Sales Agreement specifies that it is governed by New Jersey law. Section 16.16 of the Sales Agreement provides that, "all matters arising out of or relating to this Agreement, are governed by, and construed in accordance with, the Laws of the State of New Jersey, without regard to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the Laws of any jurisdiction other than those of the State of New Jersey." App. to Opening Br. at A215. Section 12.13 of the LLC Agreement, however, provides for Delaware law: "This Agreement is governed by and shall be construed in accordance with the law of the State of Delaware excluding any conflict of laws rule or principle that might refer the governance or the construction of this Agreement to the law of another jurisdiction." *Id.* at A170–71 (edited to lowercase text).

19

We agree with the trial court that the Sales Agreement did not receive formal approval from the Board, the Investors, or the Class A Majority, and therefore Logan did not have actual authority to enter into the Sales Agreement under the Related Party Provision.[52] Focusing on the Related Party Provision, the court also correctly concluded that, "[b]ecause CompoSecure had the power to enter into the Sales Agreement and could have done so if the proper approvals had been obtained, the Sales Agreement is voidable, not void."[53] It then held that the defect in the approval of the Sales Agreement could be cured by equitable defenses such as ratification. Again, leaving aside the potential applicability of the Restricted Activities Provision, we agree. We reject CompoSecure's various arguments that implied ratification is not available to cure CompoSecure's fiduciaries' failure to comply with the Related Party Provision.

Although CompoSecure argues that, in any event, the issue of ratification should be governed by Delaware law as an internal affairs matter, we find no error in the Court of Chancery's determination that New Jersey law governs the issue of implied ratification.[54] As the Vice Chancellor noted, CardUX relies on the agency-based doctrine of implied

---

[52] *Chancery Opinion*, 2018 WL 660178, at *23.

[53] *Id.* at *27.

[54] Further, CompoSecure's argument that Delaware courts cannot apply the laws of multiple states in one case is not persuasive. *See, e.g.*, *Xu Hong Bin v. Heckmann Corp.*, 2009 WL 3440004, at *6 n.9 (Del. Ch. Oct. 26, 2009) ("[F]iduciary duties . . . governed by Delaware law while general contract duties are governed by New York law.").

ratification or ratification by acquiescence—not formal ratification, which would implicate the internal affairs doctrine and Delaware law.[55]

New Jersey law allows corporate entities to impliedly ratify transactions: "It is well established that binding ratification of an unauthorized contract by a corporation 'will be implied from acquiescence or the acceptance of the benefits of such contract; it being essential to implied ratification that it and the acceptance of benefits be with knowledge of the facts.'"[56] Additionally, "silence on the part of the corporation, i.e., failure to disaffirm the unauthorized act of its agent within a reasonable time, will under certain circumstances amount to the acquiescence from which ratification will be implied."[57] Since ratification is concerned with formation of the contract, "it is the principal's acceptance of the existence of the contract that is dispositive, not its acceptance of benefits thereunder."[58] The acceptance of benefits "is merely probative of the former, i.e., evidence from which approval can be implied."[59]

---

[55] *Chancery Opinion*, 2018 WL 660178, at *27 (observing that "in [its] view, a claim of formal ratification would implicate the internal affairs doctrine and be governed by Delaware law").

[56] *American Photocopy Equip. Co. v. Ampto, Inc.*, 198 A.2d 469, 473 (N.J. Super. Ct. App. Div.) (quoting *Feist & Feist, Inc. v. A. & A. Realty Co.*, 145 A. 478, 479 (N.J. 1929)), *cert. denied*, 200 A.2d 125 (N.J.), *cert. denied*, 379 U.S. 842 (1964); *see also Elfenbein v. Luckenbach Terminals, Inc.*, 166 A. 91, 72 (N.J. 1933) ("A corporation may, however, ratify any act done without previous authority which it could have authorized, and such ratification will be implied from acquiescence or acceptance of benefits of such contract, it being essential to implied ratification that it and the acceptance of benefits be with knowledge of the fact." (citing *Feist & Feist*, 145 A. 478)).

[57] *American Photocopy*, 198 A.2d at 474. Additionally, silence amounts to ratification "where, according to the ordinary experience and habits of men, one would naturally be expected to speak if he did not consent. One of the most important of such circumstances is full knowledge of the nature and extent of the unauthorized act." *Id.* (internal citations and quotations omitted).

[58] *Id.* at 473–74.

[59] *Id.* at 474; *see also Thermo Contracting Corp. v. Bank of New Jersey*, 354 A.2d 291, 296 (N.J. 1976) ("A ratification, once effected, cannot later be revoked, even where the ratification may have

CompoSecure counters that a fiduciary's (Kleinschmidt's) failure to comply with a conflicted transaction provision (and hence, with the Related Party Provision) renders the Sales Agreement void and incapable of being ratified. In a variation of that theme, CompoSecure contends that, even if ratification were available, the doctrine requires the approval of the constituencies that held the power to authorize the transaction in the first instance, namely, the Board, the Investors, and the Class A Majority. CompoSecure relies on our decision in *Dieckman v. Regency GP, LP*[60] in support of these arguments. It contends that *Dieckman's* holding that a conflicted party may "not act to undermine the protections afforded to unitholders in the safe harbor process" requires a conclusion here that failure to satisfy the Related Party Provision's approval requirements renders the Sales Agreement void.[61]

We disagree. In *Dieckman*, we held that the implied covenant of good faith and fair dealing barred a general partner from seeking safe harbor protection where he used deceptive and misleading tactics to comply with the safe harbor's express terms.[62] We did

---

been induced by the anticipation of benefits which fail to accrue." (citing RESTATEMENT (SECOND) OF AGENCY § 102 (1958))).

[60] 155 A.3d 358 (Del. 2017).

[61] *Id.* at 368.

[62] *Id.* at 361–62, 369. The partnership agreement required that its Conflicts Committee be independent, meaning that its members could not be serving on affiliate boards. *Id.* at 360. One of the Committee's two members began evaluating the transaction while still a member of the affiliate's board, and then resigned from the affiliate's board four days after he began his review to then become a member of the Conflicts Committee. *Id.* On the same day the transaction closed, the Committee member was reappointed to the seat left vacant for him on the affiliate's board. *Id.* The proxy statement sent to unitholders did not disclose the conflicts within the Conflicts Committee. *Id.* at 365.

not discuss the distinction between void and voidable—much less a modification by contract of the common law rule. Moreover, there are no challenges on appeal to the trial court's findings that Kleinschmidt openly negotiated the Sales Agreement opposite Logan and Hollin at arms'-length, or that "CompoSecure has not identified any misrepresentations that Kleinschmidt made."[63] CompoSecure's counsel had prepared the initial draft of the Sales Agreement, which included representations that execution of the agreement had been duly authorized by all necessary company action. The trial court plausibly found that, "[g]iven how the parties were aligned at the time, [it did] not think it is reasonable to expect CardUX to have assumed the burden of ensuring that CompoSecure supplied the proper internal approvals."[64] In fact, the Vice Chancellor observed that "[i]f anyone should have ensured that CompoSecure took the necessary action to make the Authority Representations accurate, it was Logan, Hollin and CompoSecure's counsel."[65]

---

[63] *Chancery Opinion*, 2018 WL 660178, at *42.

[64] *Id.* at *29.

[65] *Id.* The Vice Chancellor correctly read our decision in *Dieckman* "as applying the implied covenant of good faith and fair dealing in its contractual sense and holding that intentional misrepresentations violated the implied covenant," and that *Dieckman* does not "support using the implied covenant as a fiduciary duty equivalent." *Id.* at *41 n.412. Indeed, in *Dieckman* we observed that, "[t]he implied covenant is well-suited to imply contractual terms that are so obvious—like a requirement that the general partner not engage in misleading or deceptive conduct to obtain safe harbor approvals—that the drafter would not have needed to include the conditions as express terms in the agreement." *Dieckman*, 155 A.3d at 361. In addition, we said that "[o]ur use of the implied covenant is based on the words of the contract and not the disclaimed fiduciary duties." *Id.* at 368. Similarly, Section 5.1 of the LLC Agreement here eliminates all fiduciary duties: "[I]n accordance with applicable law, any and all fiduciary duties of the Members and members of the Board (including fiduciary duties) to the Company or to another Member or member of the Board or to another person that is a party to or is otherwise bound by this Agreement shall be eliminated to the maximum extent permitted by law . . . ." App. to Opening Br. at A142.

For its argument that ratification requires strict compliance with the Related Party Provision's formalities, namely, authorization by the Board, the Investors, and the Class A Majority, CompoSecure relies on cases and authorities that focus on express or formal corporate ratification.[66] But as the trial court pointed out, CardUX did not invoke entity-based principles of ratification, which would involve one or more decision-makers at CompoSecure formally making the decisions necessary to authorize the Sales Agreement. Rather, CardUX invoked the agency-based doctrine of implied ratification. We find no merit to CompoSecure's challenges to the trial court's application of implied ratification principles under the circumstances presented here.

Finally, the question of whether implied ratification occurred largely depends upon factual findings that are not challenged on appeal. We do not recite them here, but the gist of the numerous findings is that of the four disinterested Board members, at least Logan, Hollin, and Herslow knew of the Sales Agreement's material terms, treated the Sales Agreement as valid and binding for months, and accepted CardUX's marketing efforts,

---

[66] For support under New Jersey law, CompoSecure relies on *Stammelman v. Interstate Co.*, 170 A. 595 (N.J. 1934). The defendant corporation's bylaws in *Stammelman* required written authorization from the board of directors to enter the lease at issue. *Id.* at 597. The appellate court held that the lease was not ratified because the board did not formally authorize it in compliance with the bylaws. *Id.*; *see also* RESTATEMENT (THIRD) OF AGENCY § 4.01 cmt. e (2006) ("If formalities are required for the authorization of an act, the same formalities are required for ratification."); 2A WILLIAM MEADE FLETCHER, FLETCHER'S CYCLOPEDIA OF THE LAW OF CORPORATIONS § 768 (2017) ("[W]hen the adoption of any particular form or mode is necessary to confer the authority in the first instance, there can be no valid ratification except in the same manner. Thus, if a corporation can only authorize a particular act or contract by a power under seal, or by a formal vote, ratification of such an act or contract must be under seal or by a formal vote, as the case may be."); 19 C.J.S. *Corporations* § 696 ("Where a particular mode of authorization is required by charter or statute, a ratification must be made in the same manner, as by a resolution of the board of directors or by a vote of the stockholders.").

24

which had generated additional business for CompoSecure.[67]  Based on the unchallenged factual findings, we find no error in the Court of Chancery's conclusion that CompoSecure impliedly ratified the Sales Agreement.

D.      *The Sales Agreement is not Protected by the Third Party Reliance Provision*

Even if it were incapable of being ratified, CardUX argues that Section 4.1(j) of the LLC Agreement (the "Third Party Reliance Provision") saves the Sales Agreement.  The Third Party Reliance Provision protects third parties by permitting them to rely on agreements executed by CompoSecure's Board, or by an officer authorized by the Board, *unless* that party is a "Member":

> (j)      Reliance by Third Parties.  Any Person dealing with the Company, *other than a Member*, may rely on the authority of the Board (or any Officer authorized by the Board) in taking any action in the name of the Company without inquiry into the provisions of this Agreement or compliance herewith, regardless of whether that action actually is taken in accordance with the provisions of this Agreement.  Every agreement, instrument or document executed by the Board (or any Officer authorized by the Board) in the name of the Company with respect to any business or property of the Company shall be conclusive evidence in favor of any Person relying thereon or claiming thereunder that (i) at the time of the execution or delivery thereof this Agreement was in full force and effect, (ii) such agreement, instrument or document was duly executed according to this Agreement and is binding upon the Company and (iii) the Board or such Officer was duly authorized and empowered to execute and deliver such agreement, instrument or document for and on behalf of the Company.[68]

The Court of Chancery held that this provision does not apply to the Sales Agreement because Kleinschmidt was a CompoSecure Board member whose knowledge of the LLC

---

[67] CompoSecure argues that the equitable doctrine of unclean hands precludes ratification.  We find no error in the trial court's rejection of this equitable doctrine.

[68] App. to Opening Br. at A138 (emphasis added).

Agreement was imputed to CardUX.[69]  CardUX argues that the court erred because

CardUX is not a "Member."  By comparison, the Related Party Provision specifically refers

to "Affiliates" in addressing conflicted transactions with "each of the Members, the

members of the Board and their respective Affiliates, or any other Related Party."[70]  Thus,

CardUX argues, the omission of "affiliates" from the Third Party Reliance Provision

"manifests an intent not to include Affiliates" such as CardUX.[71]

Under Delaware law, the knowledge of an agent acting within the scope of her

authority on behalf of the principal LLC is imputed to the LLC.[72]  The Court of Chancery

reasoned that Logan lacked actual authority to bind CompoSecure when she executed the

Sales Agreement, and that Kleinschmidt "is deemed to have known about the Related Party

Provision and its implications for Logan's ability to enter into the Sales Agreement."[73]  It

---

[69] *Chancery Opinion*, 2018 WL 660178, at \*24–25.  The trial court found that "CardUX is an Affiliate of Kleinschmidt, and Kleinschmidt was a 'Member' of the Company, defined as 'each Holder identified on Schedule A,'" and that "Kleinschmidt appeared on Schedule A as the holder of 1,081.97 Class B units." *Id.* at \*12 n.161; *see also id.* at \*25 nn.298–99 (finding that, "[b]ecause he was a member, Kleinschmidt is deemed to be a party to the LLC Agreement," and that, "[a]s a member of the Board, Kleinschmidt was a manager").

[70] App. to Opening Br. at A143.  The trial court observed that "CardUX has not disputed that it is Kleinschmidt's affiliate." *Chancery Opinion*, 2018 WL 660178 at \*12 n.160.  Further, it observed that it was "obvious" that "CardUX is, at a minimum, under the common control of Kleinschmidt, Frantz, and Flanagan." *Id.*

[71] Answering Br. at 30–31 (quoting *EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, 2008 WL 4057745, at \*10 (Del. Ch. Sept. 2, 2008)).

[72] *See ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 2012 WL 1869416, at \*15 (Del. Ch. May 16, 2012), *rev'd in part on other grounds*, 68 A.3d 665 (Del. 2013); *see also Teachers' Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 671 n.23 (Del. Ch. 2006) (Strine, V.C.) ("[I]t is the general rule that knowledge of an officer or director of a corporation will be imputed to the corporation." (citations omitted)).

[73] *Chancery Opinion*, 2018 WL 660178, at \*25.

determined that Kleinschmidt had constructive knowledge of the LLC Agreement's terms because he was a member, manager, and signatory to the LLC Agreement.[74] Moreover, the trial court found that, when negotiating and ultimately executing the Sales Agreement, Kleinschmidt acted as an agent of his principle, CardUX, and "Kleinschmidt's knowledge of the limitations in Logan's authority is therefore imputed to CardUX."[75] We agree with the Court of Chancery. Thus, CardUX cannot rely on the Third Party Reliance Provision.

### III.    Conclusion

For the reasons set forth above, we AFFIRM in part, REVERSE in part, and REMAND to the Court of Chancery for further proceedings consistent with this opinion. Jurisdiction is retained. However, we impose no specific time period for the Court of Chancery to act, recognizing that this issue could potentially change the outcome, is important to the parties, and there is no apparent need for expedition.[76]

---

[74] *Id.* The trial court credited Kleinschmidt's testimony that he had not read the LLC Agreement before signing, but found he had constructive knowledge. It noted that Section 12.11 of the LLC Agreement states that, "'[b]y executing this Agreement, each member acknowledges that it has actual notice of . . . all of the provisions hereof . . . .'" *Id.*

[75] *Id.*

[76] Supr. Ct. R. 19(c). Additionally, consistent with this Opinion, the Court of Chancery is free to consider any ancillary issues that arise on remand.