# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| COMPOSECURE, L.L.C., | § | |
| | § | No. 177, 2018 |
| Plaintiff/Counterclaim | § | |
| Defendant-Below, | § | Case Below: |
| Appellant, | § | |
| | § | |
| v. | § | Court of Chancery |
| | § | of the State of Delaware |
| CARDUX, LLC f/k/a AFFLUENT | § | |
| CARD, LLC, | § | |
| | § | C.A. No. 12524-VCL |
| Defendants/Counterclaim | § | |
| Plaintiff- Below, | § | |
| Appellee. | § | |

Submitted: July 17, 2019
Decided: July 24, 2019

Before **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices.

Following remand to the Court of Chancery. **AFFIRMED**.

Myron T. Steele, Esquire, Arthur L. Dent, Esquire, Andrew H. Sauder, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware. Of Counsel: Steven M. Coren, Esquire, David M. DeVito, Esquire, Kaufman, Coren & Ress, P.C., Philadelphia, Pennsylvania for Appellants.

David J. Margules, Esquire, Elizabeth A. Sloan, Esquire, Jessica C. Watt, Esquire, Ballard Spahr LLP, Wilmington, Delaware; Burt M. Rublin, Esquire, Ballard Spahr LLP, Philadelphia, Pennsylvania for Appellees.

**VALIHURA**, Justice:

CompoSecure, L.L.C., a manufacturer of metal credit cards, has been seeking to invalidate the Sales Representative Agreement (the "Sales Agreement") it signed with CardUX, LLC. The Court of Chancery held in a February 1, 2018 post-trial decision that the Sales Agreement had not been properly approved under CompoSecure's Amended and Restated Limited Liability Company Agreement (the "LLC Agreement"), but that CompoSecure had impliedly ratified the Sales Agreement by its conduct. CompoSecure appealed.

In our November 7, 2018 opinion, we agreed with the trial court's analysis as far as it went, but we remanded to the trial court to answer a potentially outcome-determinative question that it had not answered: whether the Sales Agreement is a "Restricted Activity" under the LLC Agreement. If it is a Restricted Activity, we noted that the Sales Agreement would be void and unenforceable. We retained jurisdiction. In its report on remand (the "Report"), the Court of Chancery held that the Sales Agreement was not a Restricted Activity, and thus, the Sales Agreement is not void. For the reasons below, we agree with the Court of Chancery's conclusions.

## I.

CardUX was co-founded by a CompoSecure director, Kevin Kleinschmidt, to market the metal cards that CompoSecure manufactures. The Sales Agreement, which CompoSecure and CardUX executed on November 9, 2015, provides CardUX with a fifteen percent commission of the net sales price of any order from a list of "Approved Prospects." On January 19, 2016, Amazon agreed with its co-branding partner, Chase, to

2

order CompoSecure's metal cards. Although CardUX's marketing efforts did not lead to the Amazon deal, CardUX, nonetheless, was entitled to fifteen percent of the net sales price because Amazon was an Approved Prospect. Without paying any commissions to CardUX, CompoSecure removed Kleinschmidt from the CompoSecure Board in May 2016 and hired litigation counsel who, for the first time, asserted that CompoSecure had not properly authorized the Sales Agreement under its LLC Agreement.

CompoSecure then sought a declaratory judgment in the Court of Chancery that the Sales Agreement was invalid based on two provisions in the LLC Agreement, namely, Section 5.4 (the "Related Party Provision") and Section 4.1(p)(ix)(A) (the "Restricted Activities Provision").[1] The Related Party Provision states that, in a conflicted transaction such as the Sales Agreement, the transaction must be approved by the CompoSecure Board, the Investors, and the Class A Majority.[2] The Restricted Activities Provision prohibits CompoSecure from entering into "any contract, agreement, arrangement or understanding requiring the Company or any of its Subsidiaries to make expenditures in excess of $500,000 during any fiscal year, other than in the ordinary course of business consistent with past practice," without prior approval by the Board, the Investors, and, during the "Earnout Period," the Class A Majority.[3] But the Restricted Activities Provision also

---

[1] CardUX counterclaimed, alleging that CompoSecure breached the Sales Agreement.

[2] App. to Opening Br. at A143 (LLC Agreement § 5.4).

[3] *Id.* at A139–40 (LLC Agreement § 4.1(p)(ix)(A)).

3

provides that "any action taken in contravention of the foregoing shall be *void and of no force or effect whatsoever*."[4]

In its February 1, 2018 post-trial decision,[5] the Court of Chancery held that CompoSecure had failed to obtain the required approvals under the Related Party Provision. But the court also held that CompoSecure had impliedly ratified the Sales Agreement because a majority of the Board supported the Sales Agreement—including Michelle Logan, who controlled the Class A Majority vote, and Mitchell Hollin, who represented the Investors—and because CompoSecure had treated the Sales Agreement as a valid and binding contract for months following its execution. As a result, the court awarded nearly $17 million to CardUX for past-due commissions, legal fees and expenses, contractual damages, and prejudgment interest. The court did not separately consider whether the Restricted Activities Provision applied to the Sales Agreement, and, if so, whether the Sales Agreement is void or merely voidable. Rather, the court only assumed that the Restricted Activities Provision applied, and the court held that it was "cumulative" of the Related Party Provision.[6]

CompoSecure appealed. It argued that the trial court failed to consider the "void" language in the Restricted Activities Provision. Specifically, it argued that the "void" language trumped the common law rule that voidable acts—those falling within the power of a corporation but not properly authorized—are subject to equitable defenses such as

---

[4] *Id.* at A139 (emphasis added).

[5] *See CompoSecure, L.L.C. v. CardUX, LLC*, 2018 WL 660178 (Del. Ch. Feb. 1, 2018).

[6] *See id.* at \*12 n.162.

implied ratification. Thus, CompoSecure argued, the Sales Agreement is void and incapable of being ratified.

In a November 7, 2018 opinion,[7] this Court affirmed the Court of Chancery's decision that CompoSecure's failure to comply with the Related Party Provision was a voidable act subject to implied ratification, and, based on the unchallenged factual findings by the trial court, we found no error with the court's conclusion that CompoSecure had impliedly ratified the Sales Agreement. We agreed with CompoSecure, however, that the trial court overlooked the "void" language in the Restricted Activities Provision. We held that, if it is a Restricted Activity, the Sales Agreement is void and incapable of being ratified. Accordingly, we reversed the Court of Chancery on that issue. But because the parties disputed whether the Sales Agreement qualified as a Restricted Activity, and because that determination "require[d] factual findings that the Vice Chancellor is better equipped to make," we remanded the case to the trial court and asked the court "to determine whether the Sales Agreement is a Restricted Activity and to make any necessary related determinations."[8] We retained jurisdiction.

The Court of Chancery issued its Report on June 5, 2019.[9] The court began its analysis by noting that the "operative term in the Restricted Activities Provision is 'requiring.'"[10] The court held that the term "requiring" is "a commonly used word with a

---

[7] *See CompoSecure, L.L.C. v. CardUX, LLC*, 206 A.3d 807 (Del. 2018).

[8] *Id.* at 810–11.

[9] *CompoSecure, L.L.C. v. CardUX, LLC*, 2019 WL 2371954 (Del. Ch. June 5, 2019) [hereinafter *Report*].

[10] *Id.* at *2.

clear meaning."[11]   Something that is "required" is "necessary or essential, and a requirement is something that must take place."[12]  Thus, a Restricted Activity "is a contract that mandates spending in [excess of $500,000 during any fiscal year], without any contingencies, conditions, or optionality."[13]

CompoSecure argued below that the Sales Agreement is a Restricted Activity because commissions for the Amazon order exceeded $500,000 in a fiscal year.  But the court held that commissions from the Amazon sale—and any other commissions—were "doubly conditional."[14]  That is, to clear the $500,000 hurdle, an Approved Prospect would have to place an order and CompoSecure would have to accept that order.  "The first condition—receipt of an order from an Approved Prospect—meant that neither CardUX nor CompoSecure could unilaterally cause any commission payment to be required."[15]  The second condition, provided for in Sections 5.1 and 5.2 of the Sales Agreement,[16] "gave CompoSecure the ability to determine unilaterally whether it would ever be required to pay

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.* ("Section 5.1 of the Sales Agreement specified that '[a]ll purchase orders solicited by [CardUX] from Approved Prospects are subject to approval, rejection or modification by CompoSecure pursuant to Section 5.2.'  Section 5.2 stated: 'CompoSecure reserves the right, in its sole discretion, to: (a) accept, or decline to accept, any purchase order for Products received from any Person . . . .'  CompoSecure undertook only to 'review proposed projects and purchase orders submitted through [CardUX] consistent with the manner in which it conducts its business in the ordinary course.'  CardUX acknowledged in the same provision that 'CompoSecure's exercise of discretion may result in no Commission owed, or a reduction or delay in the payment of Commission owed, to [CardUX] under this Agreement.'" (quoting App. to Opening Br. at A200–01 (Sales Agreement §§ 5.1–5.2))).

a commission."[17]   Thus, the court concluded, "[b]ecause of the second condition, CompoSecure could never be *required* to pay a commission unless CompoSecure determined that the order from an Approved Prospect provided sufficient value to CompoSecure to warrant accepting the order and making the commission payment."[18]

The trial court also rejected CompoSecure's arguments concerning initial projections of commissions from the Sales Agreement, made by CardUX principals, and its reliance on *ThoughtWorks, Inc. v. SV Investment Partners*.[19]   As to the initial projections, the court held that they were "preliminary, speculative, and remote from the final Sales Agreement, both temporally and conceptually."[20]   Further, it held that those projections "at most represented one side's expectations during an early phase of the negotiations," and that "[p]rojections are predictions, not requirements."[21]   As to *ThoughtWorks*—which involved a $10 million line of credit in the context of an expenditure-based restricted activities provision—the court concluded that it was distinguishable for three reasons:  the narrower language in the Restricted Activities Provision; the structural differences between the Sales Agreement and the line of credit in

---

[17] *Id.*

[18] *Id.* at *3 (emphasis added).  The court noted that "CompoSecure might decline an order for myriad potential business reasons," for example, "[a]n order might seek discounts that would not be sufficiently profitable," or "an order might require product changes or increased capacity that would necessitate additional investment by CompoSecure and distract from other opportunities." *Id.*

[19] 902 A.2d 745 (Del. Ch. 2006).

[20] *Report*, 2019 WL 2371954, at *3.

[21] *Id.*

7

*ThoughtWorks*; and, unlike here, the management in *ThoughtWorks* attempted to act contrary to the interests of the preferred stockholders whom the restricted activities provision was meant to protect.

Given those facts, the court found that the Sales Agreement *required* only two expenditures: an annual expense reimbursement capped at $20,000 and a commission advance of $10,000 per month during the first fifteen months. Combined, those two required expenditures fell short of the $500,000 hurdle. Thus, the court held that the Sales Agreement was not subject to the Restricted Activities Provision, and, as such, "the LLC Agreement did not require any additional approvals, and it was not void because of a failure to obtain them."[22] Rather, the court held that "CompoSecure's management team and its owners are now invoking the Restricted Activities Provision in an effort to enable their current selves to escape the consequences of actions taken by their former selves."[23]

**II.**

On June 7, 2019, CompoSecure submitted a letter to this Court requesting that we allow supplemental briefing or memoranda "[g]iven the important nature of the issues addressed on remand."[24] CardUX objected to CompoSecure's request the same day.[25] This Court wrote to the parties on June 11, 2019, granting CompoSecure's request and directing the parties to file simultaneous supplemental memoranda on July 17, 2019.

---

[22] *Id.* at *5.

[23] *Id.*

[24] Dkt. No. 31 (CompoSecure's June 7, 2019 Letter to the Court).

[25] Dkt. No. 32 (CardUX's June 7, 2019 Letter to the Court).

8

In its supplemental memorandum, CompoSecure raises three challenges to the Report. *First*, CompoSecure argues that the trial court effectively added language to the Restricted Activities Provision; namely, that Restricted Activities are those "requiring payment above $500,000 in any fiscal year '*without any contingencies, conditions, or optionality*.'"[26] Because the parties could have written the Restricted Activities Provision to exclude contracts with conditional requirements, but did not, CompoSecure contends that the court impermissibly rewrote that provision. *Second*, CompoSecure argues that the trial court incorrectly determined that a contract with conditions imposes no "requirements." *Third*, CompoSecure argues that *ThoughtWorks* is not distinguishable in any significant way, and that the trial court's decision "eviscerates" the purpose of the Restricted Activities Provision and "provides a playbook for management of any Delaware company to use."[27] CardUX argues in its supplemental memorandum that the Report is correct.

Upon consideration of the record before us, we agree with the Vice Chancellor's well-reasoned Report. The trial court did not "rewrite" the Restricted Activities Provision—rather, it interpreted the plain meaning of "requiring." Citing numerous definitions from several dictionaries, the court determined that "requiring" is a common word that means "necessary or essential," or "something that must take place."[28] Focusing

---

[26] CompoSecure Suppl. Mem. at 6 (quoting *Report*, 2019 WL 2371954, at *2) (emphasis added).
[27] *Id.* at 13, 14.
[28] *Report*, 2019 WL 2371954, at *2.

on the context of these specific business arrangements, the trial court explained why the

Sales Agreement is not subject to the Restricted Activities Provision:

> When the parties entered into the Sales Agreement, CompoSecure was not required to pay any commissions to CardUX, and it certainly was not required to pay a commission for the Amazon Sale. To reiterate, CompoSecure did not have any obligation to pay commissions to CardUX unless two conditions were met: first, an order from an Approved Prospect, and second, a decision by CompoSecure to accept that order. Both conditions were beyond CardUX's control. The first was a third-party decision; the second rested in CompoSecure's sole discretion. For the Amazon Sale, the first contingency was not satisfied until CompoSecure received the order for the Amazon Sale. The second contingency was not satisfied until CompoSecure decided to accept the order.[29]

CompoSecure argues that conditions in the Sales Agreement do not change the

mandatory nature of CompoSecure's payment obligation once those conditions are met.

The trial court carefully considered the language of the contract as well as the factual

record. It specifically found that "[t]he Sales Agreement only required CompoSecure to

make two expenditures: (i) an annual expense reimbursement capped at $20,000 and (ii) a

commission advance of $10,000 per month during the first fifteen months."[30] Further,

based on the record, the court found that CardUX's projected commissions were mere

"predictions, not requirements," that were "preliminary, speculative, and remote from the

final Sales Agreement, both temporally and conceptually."[31] Although the Sales

Agreement contemplated commissions, "any payment obligation was doubly

---

[29] *Id.* at *3.

[30] *Id.* at *2.

[31] *Id.* at *3. CompoSecure challenges this finding. *See* CompoSecure Suppl. Mem. at 9 n.9. However, we see no compelling reason to depart from the Vice Chancellor's findings based on his thorough review of the record.

conditional."[32]  Thus, the trial court concluded that the Sales Agreement "required total expenditures falling well below the threshold in the Restricted Activities Provision," and that, "[w]hen the parties entered into the Sales Agreement, CompoSecure was not required to pay any commissions to CardUX, and it certainly was not required to pay a commission for the Amazon Sale."[33]

In rejecting CompoSecure's argument that *ThoughtWorks* suggests that the Restricted Activities Provision should apply since the Sales Agreement contemplated future commission payments if the conditions were met, the trial court noted a difference between the two provisions. The restricted activities provision in *ThoughtWorks* contained the phrase, "any contractual arrangement *providing for* the payment of $500,000 or more per year,"[34] which is broader than the language at issue here, which applies to "any contract, agreement, arrangement or understanding *requiring* the Company or any of its subsidiaries to make expenditures in excess of $500,000 or more."[35]

CompoSecure argues that this distinction is insignificant. Instead, it argues that the contracts here and in *ThoughtWorks* are structurally similar in that, if approvals need not be obtained before entering into the contract, and approvals need not be obtained when later accepting an order that requires a commission under the contract, then management is free to commit the company to expenditures far in excess of $500,000 without ever

---

[32] *Report*, 2019 WL 2371954, at *2.

[33] *Id.* at *2–3.

[34] *ThoughtWorks*, 902 A.2d at 748 (emphasis added).

[35] App. to Opening Br. at A139–40 (LLC Agreement § 4.1(p)(ix)(A)) (emphasis added).

11

obtaining any approvals. Although there is some logic to this argument, we decline to find fault with the trial court's ruling, which, in addition to the difference in language in the two provisions, was also based upon an important factual difference.

Unlike in *ThoughtWorks*, where the company management's interests conflicted with the preferred stockholders' interests protected by the restricted activities provision in that case, the trial court here found that "every one of those constituencies" protected by the Restricted Activities Provision—the Investors, the Class A Majority, and the Board— had been "involved in the negotiation of the Sales Agreement and wanted to go forward with the contract."[36] Further, the court also found that CompoSecure's management team and its owners were aligned on, and uniformly supported, the decision to enter into the Sales Agreement. These findings are not clearly erroneous, and the trial court, based upon the well-developed record before it, grounded its ruling on its well-supported view that CompoSecure's management team and owners are now invoking the Restricted Activities Provision in an effort to avoid their decision to enter into the Sales Agreement.[37] For this reason, we reject CompoSecure's contention that the trial court's interpretation provides a "playbook" for the management of other Delaware entities to evade the requirements of

---

[36] *Report*, 2019 WL 2371954, at *5.

[37] *See id.* at *5 ("Having chosen to go forward with the Sales Agreement, and having chosen to go forward with the Amazon Sale, CompoSecure's management team and its owners are now invoking the Restricted Activities Provision in an effort to enable their current selves to escape the consequences of actions taken by their former selves."); *see also CompoSecure*, 206 A.3d at 811 ("CompoSecure admitted at oral argument that the Sales Agreement was a 'bad contract' . . . .").

12

similar provisions. Thus, like the trial court, we find CompoSecure's arguments unpersuasive.

## III.

For the reasons set forth above, we AFFIRM the Court of Chancery's Report.